[Civ. No. 3095. First Appellate District, Division One.—November 12, 1920.]

## WILLIAM DIERKS (a Minor), etc., Respondent, v. WILLIAM A. NEWSOM, Appellant.

[1] NEGLIGENCE — OPERATION OF AUTOMOBILE — EVIDENCE — PROOF OF OWNERSHIP—PRESUMPTION OF AGENCY.—In an action for personal injuries resulting from a collision between an automobile operated by a person other than the owner and a motorcycle operated by the plaintiff, proof that the automobile whose negligent operation caused the collision was owned by the defendant made out a *prima facie* case against him, since evidence of ownership of a vehicle raises a *prima facie* presumption, amounting to evidence of the fact, that the person operating it is doing so as the agent of the owner.

APPEAL from a judgment of the Superior Court of Alameda County. T. W. Harris, Judge. Affirmed.

The facts are stated in the opinion of the court.

Cooley & Lachmund and Louis V. Crowley for Appellant.

Geo. K. Ford, A. S. Humphreys and Elliott Johnson for Respondent.

KERRIGAN, J.—This is an appeal by defendant William A. Newsom from a judgment in favor of the plaintiff for damages resulting from a collision between said defendant's automobile and a motorcycle operated by the plaintiff.

For the purposes of the appeal the parties have stipulated that the evidence introduced at the trial of the case shows that the plaintiff was injured, and damaged to the full amount of the judgment by reason of the negligent operation of the appellant's automobile by his codefendant, Charles Gregory, who, while driving the car, ran into

1. Making of *prima facie* case of responsibility for negligence of driver of automobile by proof of defendant's ownership of car or employment of driver, notes, 46 L. R. A. (N. S.) 1091; L. R. A. 1918D, 924.

plaintiff, who was riding upon a motorcycle, exercising proper care in its operation and guilty of no contributory negligence. The sole question presented for determination is whether or not the appellant, as the owner of the automobile, is responsible for the negligence of said Gregory:

The latter, as a witness upon the trial, testified:

"I am one of the defendants and am twenty years old. I was a student at the Vocational High School in Oakland, and on September 4, 1917, I was driving the defendant Newsom's automobile when I ran into and injured the plaintiff. I was going to Mr. Newsom's home to leave the machine there. I had taken the machine from Mr. Newsom's garage that morning . . . I took it down to the Vocational High School for the purpose of repairing the starter. . . . It was a frequent occurrence for me to drive Mr. Newsom's machine. On one occasion I believe I drove Mr. Newsom down to 23d Avenue station. I think that is the only occasion I ever drove him in the machine, but I had driven it on a number of occasions. The first occasion of my driving that machine was on the invitation of Mr. Newsom's son, Jack Newsom. That was about May, 1917. I had taken the Newsom car down to the school for repairs on two or three occasions prior to September 4, 1917. My memory is not clear as to the number of occasions upon which I took the car down.

"Q. Well, had anybody asked you to take the machine down to the school to be repaired on the occasion other and prior to the one of September 4th? A. Yes, sir.

"Q. Who had done that? A. I think on one occasion it was Mr. Newsom.

"Q. And those are the only two occasions prior to this that you had taken the car down? A. So far as I can remember. Jack Newsom asked me to take the car to the school on September 4, 1917 . . . I do not remember Mr. Newsom ever saying anything to me about going to the garage and taking out the machine to have it repaired. He would say, 'Well, Charley, can't you take the machine down to the school to-day and have it greased up?' something of that sort; I don't know his exact words. I took the machine to the school for other purposes than greasing it; on occasions previous to September 4th. I might

repair a crank-case. I did not take the machine out for other purposes than greasing and repairing it, at the request of Mr. Newsom. On the day of the accident, September 4, 1917, Jack Newsom requested me to take the machine down to be repaired. He did so about 7:30 that morning in Mr. Newsom's yard. I do not know who first told me on this occasion that the machine needed repairing. I do not remember that Mrs. Newsom told me—I have no recollection of that. I was at the Newsom home September 3d, but did not talk with anybody in particular, except Mr. Newsom's daughter. Half of the family was out on the porch, and I think I got the idea from their talking between themselves that the car was not running good. Mrs. Newsom and her two daughters were there, but Mr. Newsom and Jack Newsom were not there. . . . My best recollection is that on the morning of the accident while I was in the car I saw Mr. Newsom going to the street-car, and said 'Good morning' to him.''

Appellant William A. Newsom testified as follows:

''Q. Had you authorized or told your son Jack Newsom to have your machine repaired or turned over to Gregory on this occasion? A. No, sir.

''Q. Have you ever at any time given your son authority to have your machine repaired? A. No, sir.

''Q. Mr. Gregory had taken your machine on previous occasions, had he not, to the school to be repaired? A. Yes, sir.

''Q. On those occasions you gave him permission to take it, or gave instructions with regard to repairing it? A. I did. . . . On the day of the accident I was in Fresno, and did not know that any work at all was being done on my car.''

On cross-examination he said:

''Mr. Gregory has spoken of repairs on my different machines over a period of three or four years, and it may have been that particular machine might have been fixed by him, but I have no recollection of it. He had always taken my other two cars down to the school to be repaired with my permission and consent. . . . Gregory had been doing repair work on my machine over a period of two or three years. I had had two other cars besides this one and he had worked on them. He had taken

them to the school—always with my permission and consent. I am not sure about the times this particular machine was taken to the school before—it may have gone once, I could not answer that question to be sure. . . . I remember some four or five months previous I sent the car down by Gregory. I had had this car about sixteen or eighteen months. I did not have more than one car at a time. All my cars had been for the general use of the family. I did not drive the car myself. Our boy, Jack, drove the car, with my permission. I did not know anything about the mechanism of automobiles myself, but I took an interest in its mechanical condition, and I certainly knew about it when it was to be repaired. I would find out that the car needed repairs by someone informing me of the fact. The car never went out without my being one of the passengers, hardly. About the only time that the car went out was on Sunday, when I would always be with the family.

"Q. Your boy, Jack, had permission to take it out? A. Well, if he did—he took it without me.

"Q. If your son Jack had your permission to take that car out, would you go with him, or his mother? A. Well, he would have to get permission at the time, on the occasion he went out.

"Q. He had no *carte blanche* to take it, and by that, if he had made the request you would have granted the request? A. When he asked me sometimes I let him take it out.

"Q. What was the arrangement about your wife having the use of this car, the machine? A. Most times, when my wife went out, she would tell me before she went out that she was going to take a ride and Jack was going to take her out.

"Q. She would tell you? A. She would ask me about it, yes. She sometimes went out without my being present. She would ask me if she could have Jack drive her out.

"Q. Did your daughters or your son, with your permission or your consent, take that car out there very much without consulting yourself and your wife? A. No.

"Q. They did not? A. No, they did not.

"Q. Was there any permission granted to Gregory on the day he took this automobile involved in the accident, down to the school? A. No.

"Q. Had there in fact been a permission— A. No— by me, you mean?

"Q. Yes. Well, I might go back on these previous occasions when he had taken it down, did you object to his having taken it? A. No, because I always told him to take it on all previous occasions; I had told him to take it. On the previous occasions when the car had been taken by Gregory to the school to be repaired, I had learned it needed repairs by driving out in the car with my boy, Jack, and I would notice something was wrong with the car. I would not know what particularly went wrong with it. I would simply know that the car was not working right. Up to the time of the accident, September 4, 1917, Jack was the only one in the family that knew how to drive the car."

[1] The plaintiff made out a *prima facie* case against the appellant when he showed that the auto causing the injury by the negligent manner of its operation belonged to the appellant. It has been held in California and other jurisdictions that evidence of the ownership of a vehicle raises a *prima facie* presumption, amounting to evidence of the fact, that the person operating it is doing so as the agent of the owner. (*McWhirter* v. *Fuller,* 35 Cal. App. 288, [170 Pac. 417].) To successfully rebut this presumption evidence must be introduced which carries conviction to the mind of the court. Here it may be said that the evidence introduced by the appellant made out a complete defense if full credence was given to it by the trial court; but the court was not bound to thus unreservedly accept it, even if uncontradicted. The court saw and heard the witnesses testify, and with this advantage, not enjoyed by us, it was for it to determine the degree of credence to be accorded to this testimony. It is not essential that the credulity of the court should correspond with the positiveness with which a witness testifies. A court may reject positive testimony, although it be not contradicted or impeached by any direct testimony. Its inherent improbability may be such as to deny it all claims to belief. A witness' manner of testifying may give rise to doubts as to his sincerity, or create the impression that the facts testified to by him are colored or not correctly stated. (*County of Sonoma* v. *Stofen,* 125 Cal. 32, 35, [57 Pac. 681]; *Bellus*

v. *Peters,* 165 Cal. 112, 117, [130 Pac. 1186]; *Pacific Coast Dried Fruit Co.* v. *Sheriffs,* 31 Cal. App. 137, [159 Pac. 986]; *Denison* v. *McNorton,* 228 Fed. 401, 406, [142 C. C. A. 631].)

But we are also satisfied that there was a conflict in the testimony in an important respect, for Charles Gregory testified that when he took charge of the car on the morning of the accident he saw and spoke to the appellant. If the court believed this testimony it follows that it rejected that of the appellant to the effect that he was in Fresno on the day of the accident; and he may have viewed with distrust other material statements made by him, and have concluded that the appellant, having seen Gregory driving the car on that morning, and not objecting thereto, ratified his action in taking the car for the purpose of having it repaired. In support of the judgment we are bound to assume that the court took this view of the record.

The trial court having thus concluded upon sufficient evidence that Gregory was authorized by the appellant to take the car for the purpose of having it repaired, its judgment holding the appellant responsible for Gregory's negligence in performing his mission must be affirmed, and it is so ordered.

Richards, J., and Wood, J., *pro tem.,* concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on December 10, 1920, and a petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on January 10, 1921.

All the Justices concurred, except Wilbur, J., who dissented.