[S. F. No. 16338.   In Bank.—June 14, 1940.]

VIOLET HUDDY, Respondent, v. THE CHRONICLE PUBLISHING COMPANY (a Corporation), Appellant.

George K. Ford and Simpson Finnell, Jr., for Appellant.

R. G. Partridge and Wallace O'Connell for Respondent.

CURTIS, J.—In this action plaintiff sought to recover judgment for personal injuries suffered by her when an automobile in which she was riding as a guest in the city of San Francisco was struck by a Hupmobile sedan driven by Donald O'Brien, an employee of the Chronicle Publishing Company. It was alleged in the complaint that the proximate cause of the collision was the negligent operation of said Hupmobile sedan by Donald O'Brien, and that at the time of said accident said automobile was being operated and driven by him as the agent, servant, and employee of the Chronicle Publishing Company. Before trial the case against O'Brien was dismissed without prejudice. A motion for a nonsuit and for a directed verdict made by defendant was denied. At the close of an eight-day trial, a verdict was returned by the jury against the Chronicle Publishing Company in plaintiff's favor in the sum of $3,231. From the judgment entered thereon, the defendant Chronicle Publishing Company has appealed.

The accident occurred between 11:10 and 11:30 P. M. on the night of January 28, 1937, on Potrero Avenue just south of its intersection with Twenty-fourth Street. Appellant does not deny that the proximate cause of the collision was the negligent operation of the automobile by O'Brien. Appellant does deny that O'Brien, who was employed by it in its home delivery department, as manager of district N, was engaged at the time of the accident in any service for the Chronicle Publishing Company, and insists that there is not sufficient evidence in the record to support the implied finding of the jury that he was at the time and place of the accident acting within the scope of his employment.

Appellant relies upon the fact that the employment of O'Brien as district manager in the home delivery department required him to perform specific work in connection with the

distribution of the Chronicle newspapers to carriers under him in a specified district and during certain specified hours, and that the accident happened outside the limits of O'Brien's district and at a time when his regular duties in connection with the distribution of Chronicles to his carriers did not require him to be at work. At the outset it may be admitted that O'Brien was not engaged at the time of the accident in his regular duty of delivering papers to the carriers in his district for distribution by him on their regular routes. His regular duty in this regard did not require his presence at the appellant's plant until about 3 A. M. each morning when he received the bundles of newspapers which came down the chute to the sidewalk at the Fifth Street entrance to the Chronicle building. In order to deliver the papers to the twenty carrier boys under him, it was necessary for him to own a car, and he was paid $30 per month as allowance by the Chronicle for the use of his car. He usually completed his deliveries by 6:30 A. M. and his time was his own until a short time prior to 3 P. M. when he was required to report to the city circulation manager in charge of the district managers employed by the home delivery department to go over with the city circulation manager any details which were necessary to his work, such as giving notice of "stops" and new subscriptions. He was then through with the regular routine duties connected with the distribution of the papers until the next morning at 3 A. M. The accident, as before noted, occurred between 11:10 and 11:30 P. M. and outside the limits of his district.

Respondent while admitting that O'Brien was not performing the specified work of delivering papers to the carriers in his own specified district and during the specified hours which this particular duty required, points out that his duties were not limited merely to the delivery of the newspapers to the carrier boys and reporting to the city circulation manager, but included any act which he might deem desirable for the betterment of the service, such as visiting the carriers under him to school them in their duties, or to encourage them to secure new subscribers, as each district manager had to maintain a certain production record throughout the month. District managers occasionally supervised the collection by the carriers, and if any carrier was delinquent, his district manager was "supposed to go into the matter with him". The

duties of the district manager also consisted in picking up, at the end of each month, the newspapers which had not been sold by the carriers and returning them to the Chronicle so that each carrier could receive credit for the newspapers so returned. It should be noted with reference to the duty on the part of district managers of picking up "returns" and delivering them to the Chronicle that it was necessary that the newspapers be picked up and turned in on a certain stipulated day when a special man was on duty at the plant for the purpose of checking them in, and if they were not returned at the end of the month at the stipulated time, they could not be returned until a month later, and no credit would be given to the carrier boys until the following month.

It is respondent's position that O'Brien, at the time of the accident, was either engaged in attending to one of these duties which were in fact as much a part of his employment as his regular routine duty of delivering the home delivery papers to his carriers within his district, or that he had been pressed into special service to deliver "extras" bearing news of the settlement of the longshoremen's strike, which had been tying up the port of San Francisco, to the Bayshore dog tracks, and was on his way to the Bayshore dog tracks when the accident happened. Only O'Brien himself could testify directly as to the mission on which he was engaged at the time and place of the accident, whether he was in fact engaged in a personal mission of his own, or engaged in performing a service for the Chronicle Publishing Company. It appears that he was removed from the emergency hospital to St. Mary's hospital, and that he thereafter left the state without returning to his employment with the Chronicle Publishing Company. A letter was afterwards received by the city circulation manager from Nevada, but the letter was not preserved, and his whereabout were apparently unknown at the time of the trial. It is obvious that in the absence of the testimony of O'Brien, plaintiff was necessarily limited in attempting to prove the issue of his employment at the time and place of the accident, to proof of facts and circumstances from which an inference of his employment could logically and reasonably arise, and the defendant was likewise limited to proof of facts and circumstances which would logically and reasonably disprove any inference of such employment, the burden in the first instance being upon the plaintiff to establish a *prima*

*facie* case before it was incumbent upon the defendant to offer evidence in opposition thereto.

■ The first question to be asked and answered, therefore, is whether plaintiff has initially established a *prima facie* case with reference to this issue of employment. Section 1958 of the Code of Civil Procedure states that, ''An inference is a deduction which the reason of the jury makes from the facts proved without an express direction of law to that effect,'' and section 1960 of the same code states that, ''An inference must be founded: (1) On a fact legally proved; and (2) On such a deduction from that fact as is warranted by a consideration of the usual propensities or passions of men, the particular propensities or passions of the person whose act is in question, the course of business, or the course of nature.''

■ Two facts were definitely and positively proved and established by plaintiff which in our opinion reasonably warrant the deduction therefrom that O'Brien at the time and place in question was engaged in performing a service for the Chronicle Publishing Company. First: There was affixed to the windshield of O'Brien's car a ''Press Car'' card, bearing the owner's name, the car number and the signed authorization of the circulation manager of the Chronicle Publishing Company, which card according to the testimony of said circulation manager, himself, was to be used by Chronicle employees only while on duty. Second: There was piled up on the rear seat of the Hupmobile and on the floor to the level of the rear seat, four or five bundles of Chronicle newspapers of approximately 100 copies to the bundle, tied around with hemp rope in the manner in which said newspapers are usually wrapped for delivery to the various newsboys and carriers around the city.

The first fact, ''legally proved'', upon which respondent justifiably relies to warrant the inference of employment of O'Brien by appellant at the particular time and place was the fact that at the time of the accident, O'Brien was displaying on the lower right-hand corner of his windshield a ''Press Car'' card on which, under the words, ''Press Car'', appeared the words, ''San Francisco Chronicle''. Four witnesses, one of whom was Mr. Neish, an employee of the Chronicle, testified that they had seen this ''Press Car'' card in the lower right-hand corner of the windshield of the Hupmobile immediately after the accident, and although the card

disappeared after the accident, the fact that it was being displayed by O'Brien at the time must be accepted as an established fact. Mr. Neish, who arrived at the scene of the collision immediately after it occurred, testified that he noticed the "Press Car" card and looked at the name on it to identify the driver of the Hupmobile sedan. He stated that the card displayed by O'Brien, in addition to the words, "Press Car, San Francisco Chronicle", also bore the car number, the owner's name and the proper authorization. A "Press Car" card was introduced in evidence and identified by Mr. Neish as being similar to the card which he saw displayed on the windshield of the Hupmobile sedan. This card is a white card, 10 inches by 5 inches, printed on heavy white cardboard.

This "Press Car" card, according to the testimony of Mr. Gilroy, circulation manager of the Chronicle, was the official sign put out by the Chronicle and was issued to its employees under strict orders that the signs were not to be used except when the employees were on duty. Appellant attempted to prove that the use of the card was restricted to the immediate vicinity of the Chronicle building, being furnished to the drivers who delivered its newspapers to enable them to secure parking space there. This attempted limitation of the use of the "Press Car" card to the immediate vicinity of the Chronicle building was offset by the testimony of Mr. Maguire, the news vendor for the Examiner at the corner of Twenty-fourth Street and Potrero Avenue, who testified that he frequently saw cars with such signs pass his corner. It should be here stated that although the appellant has consistently spoken of this "Press Car" card as a "sticker" thereby giving the impression that it was permanently attached, and that it was on the car at all times irrespective of whether the driver was or was not on company business, there is not an iota of evidence in the record to indicate that such card was in fact permanently attached to the windshield of O'Brien's car, whether by pasting or by any other means. None of the witnesses who testified to seeing the card was able to remember how it was attached. We have examined the "Press Car" card, which was introduced in evidence as an exhibit and identified as being similar to the card displayed by O'Brien, and there is nothing whatever in the make-up of said card to indicate that it was intended to be permanently affixed. It may be said parenthetically that the fact that the "Press

Car'' card disappeared after the accident and could not be found might be some indication that the card was not firmly pasted on the windshield.

The second foundational fact upon which respondent justifiably relies as giving rise, in conjunction with the display of the ''Press Car'' card, to the inference that O'Brien was engaged in a service for the benefit of the Chronicle Publishing Company is the fact that at that time he was transporting four or five or more bundles of Chronicle newspapers tied up with hemp rope as if for delivery. There is some question as to whether the papers contained headlines relative to the settlement of the longshoremen's strike and bore the word, ''Extra'' across their face, or whether they did not, but in view of the overwhelming testimony of at least three disinterested witnesses, including Mr. Neish, the Chronicle employee, there can be no question that in fact there were several bundles of Chronicles tied up with hemp rope in the rear of O'Brien's car at the time of the accident. These bundles of newspapers disappeared after the accident. Mr. Nicolini, a drayman, who was standing at the corner of Twenty-fourth Street and Potrero Avenue, having just bought an Examiner from the news vendor there when the collision occurred, testified that he looked in the rear of the Hupmobile sedan after the accident through the right-hand door which was open and saw four or five bundles of Chronicle newspapers across the back seat tied with hemp rope and that there was stacked on the floor behind the front seat other bundles to the level of the rear seat. One of the bundles on the floor was broken open. He testified that the headlines on all the papers were identical and had the word ''Extra'', the name, ''Chronicle'', and ''something about the stevedores going back to work''. Mr. Hansen, who was employed in the Purity Store at the corner of Twenty-fourth Street and Potrero Avenue, testified that he saw bundles of newspapers in the rear of the Hupmobile sedan, tied with a rope in bundles of about a foot and a half high, and stated that there were some loose ones on the floor. He looked in through the rear window and saw they were Chronicles but did not notice whether or not the word ''Extra'' was on the front page. Mr. Gray, a municipal railway motorman, testified that he had gone over to the Hupmobile after the accident, and had noticed that the rear fender ''was lower down than usual'' over the rear wheel. Mr. Neish, the

Chronicle employee, testified that there were a few papers spilled on the street and there were papers inside the car that were partially tied up. He stated that they were tied up loose with rope. His testimony was: ''The papers were on an angle in the back of the car, and they were loose. The rope had not been cut, but they were just loose papers. It slid out from under the tie of the rope.'' He had not examined the papers as to dates and did not notice any headlines on the papers with reference to the marine strike being settled. Mr. Lown, who examined the Hupmobile the next morning at the garage to which it had been towed, testified that he found no bundles of newspapers in the car and no rope, that there were no newspapers on the rear seat but there were a number of newspapers scattered on the floor in the rear which bore various dates just previous to the accident. From the presence of such a large quantity of newspapers in the car of its employee, it seems quite reasonable and logical to infer that such employee was engaged in performing a service for his employer.

We are of the opinion that these two facts, ''legally proved'': the existence of the ''Press Car'' card on the windshield of the automobile which the Chronicle employee was driving at the time, and the presence of such a large quantity of Chronicle newspapers as he was transporting at the time, are quite convincing proof of the active engagement of such employee in the service of the company, and makes the inference that he was so engaged seem logically much more reasonable than the contrary inference that he was not so engaged.

While it was not possible for the respondent in the absence of O'Brien to positively establish the exact errand on which O'Brien was engaged at the time, and we do not deem this necessary in view of the fact that his duties, other than his routine duty of delivering papers to his carriers, were not limited to any particular time and place, two plausible explanations have been suggested. While appellant has offered evidence which is quite convincing, and if believed by the jury would have compelled the conclusion, that the second explanation of O'Brien's errand was not the correct one, nevertheless, no evidence at all has been offered to disprove the first explanation. In the absence of such proof, appellant has failed to overcome and dispel the inference which consti-

tutes respondent's *prima facie* case with reference to the issue of employment.

In *Engstrom* v. *Auburn Auto Sales Co.*, 11 Cal. (2d) 64 [77 Pac. (2d) 1059], it is stated that "an inference is dispelled as a matter of law when it is rebutted by clear, positive and uncontradicted evidence, which is not open to doubt, even though such evidence is produced by the opposite party. . . . Of course, if the opposition evidence is conflicting, vague or uncertain or is weakened by contradictions or improbabilities, an inference is not dispelled as matter of law." With this rule in mind, we shall discuss the evidence with reference to the service on which O'Brien was engaged at the time.

The first explanation suggested is that O'Brien was engaged in some duty connected with a pickup of the "returns". As before noted, there is evidence in the record that one of the duties of a district manager was to pick up and return at the end of the month newspapers which had not been sold by the carriers and that they had to be returned at a special time to be checked in. The day of the accident was Thursday, January 28th, and the next day, Friday, the 29th, according to the records of the Chronicle Publishing Company was O'Brien's day off. Usually the district managers picked up the "returns", which took two or three hours, in the morning, but they could be picked up at night. O'Brien was "a good employee and the company was pleased with his work". Mr. Tennant, city circulation manager, and O'Brien's superior, stated that he had observed him on various occasions around the office at odd hours and that it was a fair statement that he seemed quite wrapped up in the newspaper business and enthusiastic about his job. On the evening in question, Thursday, January 28th, he had seen O'Brien at the office when he, Tennant, left at 6:15 P. M. If the testimony of Mr. Lown that the newspapers which he found on the floor of the Hupmobile the next morning after the accident bore various dates just previous to the accident be accepted as proof that these same newspapers were among those present in the car at the time of the accident, the deduction seems reasonable therefrom that O'Brien at the time of the accident was engaged in his duty of picking up "returns". This seems particularly reasonable in view of the fact that it was so close to the end of the month and the next day was O'Brien's day off. No proof was offered by the appellant which would disprove

this explanation such as proof from its employment records that none of the carriers delivering papers within O'Brien's district lived outside the district, or that the "returns" for the month had already been collected and turned in.

There was also found by Mr. Lown in the glove compartment of the Hupmobile a book of subscription bills, a pad of deposit slips of the Bank of America, having printed at the top "The Chronicle Publishing Company, Carriers Account, at San Francisco-Main Office, Branch No. 66, Deposited by Route No. ———", and also a rubber stamp bearing this notation, "Pay to the Order of Bank of America, For Deposit to the credit of The Chronicle Publishing Company, Carriers' Account, 66". However, as it is quite probable that these articles were kept by O'Brien in the compartment at all times, their mere presence would not be sufficient to give rise to an inference that he was on his way to contact a carrier with reference to his collections. The same criticism, however, is not applicable to the presence of the large quantity of newspapers, tied up in bundles, as it does not appear reasonable that in the absence of some task for his employer, he would be carrying them around in his car.

The second explanation is that O'Brien was pressed into service to deliver extras bearing news of the settlement of the longshoremen's strike to the Bayshore dog tracks. This explanation is based primarily upon the testimony of Mr. Nicolini that the newspapers which he saw in the rear of the Hupmobile bore the headlines "Extra" and contained news about the stevedores going back to work. That he was endeavoring to reach the Bayshore dog tracks before the races were over and the "crowd broke" would afford some explanation of his erratic driving and breakneck speed, as the races usually closed around 11:10 and 11:15 P. M. While O'Brien's routine job permitted him to leave the Chronicle building at 3 P. M. there is no testimony as to the time he actually did leave the building on the night in question, and the testimony of the city circulation manager was that O'Brien was there when he left at 6:15 P. M.. Potrero Avenue is on the direct route to the Bayshore dog tracks. While the appellant denied using "relays" or extra men to deliver their bundles of papers when their regular delivery men were not available there was testimony of the Examiner news vendor at the corner of Twenty-fourth Street and Potrero Avenue that infre-

quently the Chronicle newspapers had been delivered to the Chronicle news vendor at the same corner by other than the regular delivery man. There was also the testimony of the regular man, Mr. Lund, who had charge of the sales at the Bayshore dog tracks that he was busy with his regular delivery service on the night in question and that it would have been impossible for the office "to get hold of him" on the phone to ask him to get extras from the plant for distribution if any had been published that night. The fact that plaintiff was on her way home from the dog tracks, having attended the last race, and had already reached Twenty-fourth Street which is about a mile from the dog tracks does not necessarily prove that no attempt was being made by the appellant to reach the dog track patrons. The races did not close at the same time every night and anyone leaving the Chronicle building would not know whether or not the tracks had closed until he reached them. If O'Brien had stopped for reasons of his own on the way to the dog tracks, as intimated by the testimony of Mr. Neish who testified that he first saw O'Brien's car pulling out from a parking space at Eighteenth Street and Potrero Avenue at which corner a beer parlor was located, he could have left the Chronicle building with sufficient time to reach the dog tracks before closing time if he had not stopped. It appears from this brief *résumé* that the explanation that O'Brien was on his way to deliver extras to the Bayshore dog tracks is a reasonable one. Besides the testimony of Mr. Nicolini that he actually saw extras in the rear of O'Brien's car, saying "something about the stevedores going back to work", is we think amply sufficient to support the inference that O'Brien was transporting extras to the Bayshore dog tracks, unless such inference was dispelled by clear, positive evidence, not open to doubt, produced by the appellant. (*Engstrom* v. *Auburn Auto Sales Co., supra.*)

The appellant claims to have produced evidence which as a matter of law completely dispels any inference that O'Brien was delivering extras to the Bayshore dog tracks at the time in question. This proof is the testimony of their press foreman, Mr. Wooster, testifying with reference to the pressroom records of the night in question to the effect that the first edition published that night which was an extra and which contained any news with reference to the settlement of the strike, was the CCCC edition which bore "Extra" across its

face, and in large letters the words "End of Strike in Sight", and that the press for the CCCC edition was not started until 12:04 A. M., which was obviously after the accident had occurred. Both the Chronicle and the Examiner for that evening were late in being delivered to the news vendors at the corner of Twenty-fourth Street and Potrero Avenue, and the Examiner edition which arrived immediately after the accident contained headlines announcing the end of the strike. The appellant admits that the strike had in fact terminated, but alleges that on this particular occasion they were "scooped" by the Examiner, although they offered no explanation for the "scoop" which concerned a matter of great public interest and of which the settlement was no secret. There were also offered in evidence by the appellant the testimony of Mr. McCarty, head of the street sales department of the Chronicle, who had charge at the Fifth Street entrance of the Chronicle building of the delivery of the bundles of newspapers to the delivery men, and whose duty included checking out to the district men under him the bundles of newspapers to be delivered by them to the news vendors. Mr. McCarty's testimony was to the effect that no notation of any papers being delivered to O'Brien on that night appeared in the little black book which was his own personal record and in which he kept track of the bundles delivered to the district men. He also denied that he ever employed home delivery men for use in the street sales department even in an emergency.

Certainly this testimony, if accepted as true, compels the conclusion that O'Brien was not engaged in delivering strike extras. Obviously, however, the jury did not accept it at its face value, and we cannot say as a matter of law that its rejection was wholly unwarranted. In testifying with reference to the printing of the various editions on that particular night, Wooster testified that the times of printing the various editions were as follows:

C ................................... 5:26 to 6:10 p. m.
CC ................................. 8:06 to 8:40 p. m.
CC* ................................ 9:27 to 9:40 p. m.
CCC ............................... 10:25 to 11:15 p. m.
CCCC ............................. 12:04 to 12:11 p. m.
CCCC* ............................. 1:29 to 2:24 a. m.
CCCC** ............................ 2:30 to 3:58 a. m.

Seven newspapers bearing these edition identification marks were introduced in evidence by the Chronicle as a complete file of all the editions printed that night. It was explained that the "Cs" applied to regular editions and the "C-stars" were editions in which "replates" or pages different from the regular edition were inserted. Wooster admitted that after a certain edition had gone to press and had been partially printed and had then been stopped for new and additional news, the newspapers carrying the additional news could bear the same designation with which the edition had started. In other words, newspapers containing the identification marks of the same edition might contain different news and headlines. Although the press records referred to in his testimony by Wooster contained no record of a newspaper designated as CCC*, which is the identifying mark which an edition containing strike news prior to the CCCC edition would bear, nevertheless, in the CCCC edition introduced in evidence there appears on an inner page an insert labeled CCC*, which is an indication that the pressroom record for that night was not complete. Likewise, upon cross-examination, in looking at his pressroom record for March 4, 1938, Wooster stated positively that no paper labeled CCCC**** had been printed, but such a paper bearing this identification mark was produced by the attorney for the respondent. This accumulated evidence was sufficient to show that the records of the pressroom, which would ordinarily be assumed to be correct, were not necessarily infallible. Likewise, Wooster admitted that the time of the different editions' going to press did not in fact necessarily correspond with the edition identification marks which actually appeared on the newspapers themselves. To dispel the inference of employment, it was necessary for the evidence produced by appellant not only to be clear, positive and uncontradicted, but *not open to doubt*. In this regard, we think the language used by the court in the case of *Dierks* v. *Newsom,* 49 Cal. App. 789 [194 Pac. 518], is applicable. The court there said: "The evidence introduced by appellant made out a complete defense if full credence was given to it by the trial court; but the court was not bound to thus unreservedly accept it, even if uncontradicted. The court saw and heard the witness testify, and with this advantage, not enjoyed by us, it was for it to determine the degree of credence to be accorded this testimony. It is not essential

that the credulity of the court should correspond with the positiveness with which a witness testified.'' In view of the positive testimony of Nicolini that the several bundles of newspapers with which O'Brien's car was loaded at the time of the accident bore the caption ''Extra'' across their face, and contained news with reference to the stevedores going back to work, in which testimony he was not shaken, considered in conjunction with the showing that the records of the pressroom of the Chronicle with reference to the printing of the various editions were not so definite or infallible as to preclude the possibility of error as to the time the edition bearing the strike news came off the press, we are satisfied that the evidence produced by the appellant does not as a matter of law dispel the inference of employment established by respondent as her *prima facie* case.

Certain minor points are raised by appellant in which we find no merit. Appellant complains that the trial court erred in giving an instruction to the effect that the jury could find in accordance with an inference which they might reasonably make from circumstantial evidence even though direct evidence to the contrary has been introduced by the defendant. It is not the rule that a jury must accept as true all direct evidence offered in opposition to an inference. If the direct evidence to the contrary is not clear, positive, uncontradicted, and is not free from doubt, the jury is entitled to reject it. The instruction is, therefore, not subject to criticism.

The appellant also complains of the misconduct of the attorney for the respondent in asking Mr. Gilroy, circulation manager of the Chronicle, if the company did not require O'Brien to carry insurance on his car. The question of whether the witness should answer the question was argued without the presence of the jury, the objection thereto was sustained, and the question was not answered by the witness. It is to be noted that the question was directed only to the ascertainment of whether insurance was carried by O'Brien, against whom the action had been dismissed, and not whether insurance was carried by the Chronicle Publishing Company. The asking of such question, relative to the insurance carried by a *third party*, was not such prejudicial error as to warrant a reversal of the judgment.

We find no error in the fact that the attorney for the respondent examined witnesses for appellant as to their diligence in ascertaining the whereabouts of O'Brien. Since essentially only O'Brien knew precisely what he was doing at the time and place of the accident, his testimony was, of course, extremely vital. While there was no legal duty on either party to produce O'Brien, in view of the provisions of subdivision 6 of section 2061 of the Code of Civil Procedure that "evidence is to be estimated not only by its own intrinsic weight, but also according to the evidence which it is in the power of one side to produce and the other to contradict", we think it was relevant and material for respondent to inquire whether it was within the power of the appellant to procure the presence of O'Brien at the trial. This was a legitimate field of inquiry.

The judgment is affirmed.

Carter, J., Shenk, J., Gibson, J., and Edmonds, J., concurred.

Rehearing denied.