[Civ. No. 15220. Second Dist., Div. Two. Dec. 24, 1946.]

HAROLD P. DODDS, Respondent, v. ROBERT WOODLEY STELLAR, Appellant.

Lasher B. Gallagher for Appellant.

Hahn, Ross & Philip W. Silver for Respondent.

MOORE, P. J.—Respondent sued for damages alleged to have resulted from injuries suffered from appellant's negligent use of a fluoroscope in examining respondent's hand. Following a verdict against appellant for $10,000 general damages and $4,942.05 special damages, judgment was entered for the aggregate of the two sums and for costs. On this ap-

peal reversal is demanded on the grounds of (1) insufficiency
of the evidence to support a judgment for any sum, (2) in-
sufficiency of the evidence to support the implied finding that
respondent's total damage was the proximate result of an
X-ray burn sustained by reason of the negligence of appellant,
and (3) prejudicial errors in the giving and in the refusal of
instructions.

*Proof of General Damage*

 In the latter part of October, 1941, respondent while
at work for the California Shipbuilding Corporation suffered
a bruise and laceration between the distal and medial phal-
anges of his middle, left finger about the size of a dime when
a steel beam fell upon it. He reported at once to the first-aid
hospital where under the direction of Doctor Waterman, an
employee of appellant, he extended the injured member for
ten minutes into the radiation of the X-rays applied in con-
junction with a fluoroscope while the physician examined the
injury. He then soaked it in a solution of epsom salts after
which it was dressed with ointment and bandaged. He re-
turned at intervals of two or three days for three weeks for
the treatments while he continued at his work. Although he
favored the finger it did not cause him any distress. After
the sixth treatment the injury healed. About four days later
it broke open, making a wound about half an inch in length.
Thereafter it habitually healed in approximately a week and
broke open again in four days. This continued for almost
seven months, during which time respondent did not report
this capricious behavior to anyone in the hospital. He re-
turned to the emergency hospital on July 3, 1942, when a
callus had formed over the wound, and an X-ray was made
of the injured area. He then obtained from the hospital a
piece of adhesive tape and wrapped it around the sore spot.
It remained for four or five days during which he felt a burn-
ing, irritating pain which had first occurred about a month
prior to the formation of the callus. On removing the tape
the callus came off. He then returned to the hospital where
he was referred to appellant. He discontinued work July 15.
After an examination by an associate of Doctor Stellar at the
latter's office respondent was examined next on August 14,
1942, by Doctor Foster, a specialist in dermatology. At that
time the doctor found "on the anterior surface of the finger"

an arthrempyesis* about a half inch in diameter with a small ulcer in the center. The posterior surface was smooth and red. Basing his opinion upon such examination and upon the history given by the patient, Doctor Foster testified that his diagnosis was "X-ray ulcer with dermatitis" which means an ulcer produced by radiation of radium or X-ray with the surrounding area inflamed. The only variation of the history as given at the time of the examination to Doctor Foster from that proved at the trial is that respondent there for the first time admitted that he had returned to the field hospital on July 3 for further examination instead of in March as stated to Doctor Foster.

On August 31, 1942, respondent was examined by Doctor Meland to whom he stated substantially the same history as that given to Doctor Foster except that the month of removing the adhesive and exposing the ulcer was May instead of March. He complained to Doctor Meland of pain in his arm as well as in the ulcer. The diagnosis was "trophic ulcer, consistent with roentgen dermatitis," meaning an "ulcer that has no tendency to heal, that appears secondary to a large dose of radiation usually administered through the X-ray tube." The doctor saw him twice in September and twice in October and administered medicaments: pantocain and sulpha drugs to the wound, leaves of cactus plant, radon ointment, lanolin and vaseline. He finally recommended excision of the ulcer which was performed by others at the hospital on October 9, 1942. This operation did not clear up the infection which was in the wound on August 31. He testified that the pain caused by an X-ray burn is of a burning type with occasional stabbing sensations. The excision was down to the tendon. There was then a possibility of doing a graft but the infection could not be cleared up. The patient suffered a red rash with water blisters as a result of his allergic reaction to the sulpha drugs and continued to have pain which could be relieved only by codein. Doctor Meland recommended amputation of the entire finger to which respondent acquiesced and the operation was performed December 1, 1942. The swelling progressed up his arm and the increased temperature and redness of the skin necessitated the opening of the wound on December 17. The wound healed slowly. Respondent was discharged from the hospital February 10, 1943.

---

*Arthrempyesis: Suppuration in a joint.

The injured man was examined October 7, 1942, by Doctor Shelton at the California Hospital. The case history as given to him by the patient was as follows: "I went to the First-Aid Emergency Hospital on Terminal Island where a fluoroscopic examination was made. No fracture was reported. There was a cut on the finger which healed but left quite a thick callus-like area which continued to be painful. I went back to work, but the same continued and X-rays were made. The callus and skin broke down, drained, and did not heal afterwards." Basing his opinion upon his examination and the history Doctor Shelton testified that it was a "trophic ulceration with dermatitis . . . consistent with an X-ray burn. . . . There was some fibrosis changes in the tissue such as accompany trophic ulceration and circulation was impaired in that area. . . . I thought amputation would probably be necessary . . . but in view of the patient's objection I thought we would try the next best thing . . . to remove the ulcer and scar . . . with the idea of putting a graft of skin . . . in the defect after the effects had healed." With Doctor Meland's concurrence Doctor Shelton excised the ulcerated area down to the level of the tendon sheath for the purpose of grafting over the area. They had little hope of success but gave respondent the benefit of such procedure, since he preferred not to have an amputation. He discovered "changes in the tissue such as accompany trophic ulceration. . . . My opinion was that if the finding which we noted could be due to X-ray, if there was a definite X-ray exposure it would account for the condition. The wound had a persistent septic, low-grade bacterial infection. It is possible for a chronic ulcer to develop with repeated trauma to an infected wound."

Doctor Wright, a specialist in pathology, made a microscopic examination of the tissue taken from respondent's ulcer. This showed such changes as characterize prolonged X-ray radiation. On December 1, 1942, he examined the amputated finger which also revealed changes caused by an X-ray burn and observed that there are no causes for such changes other than radium or X-ray radiation.

The responsibility of appellant for any injury to respondent proved to have resulted from the fluoroscopic examination on October 30, 1941, was admitted by appellant at the trial and was established by the testimony of his assistant, Doctor Waterman.

From the foregoing résumé of portions of the testimony of the four expert witnesses no doubt can obtain that the jury had ample competent proof that the injuries suffered by respondent were the result of a radiation burn. Discrepancies in the testimony, contradictory statements by respondent and possibilities that the ulcer might have been caused by trauma or other influences were resolved by the jury in deriving the ultimate fact of respondent's X-ray burn. ▆▆ In such cases it is not necessary to demonstrate conclusively the negligence of the physician. (*Barham* v. *Widing,* 210 Cal. 206, 215 [291 P. 173]; *Mirich* v. *Balsinger,* 53 Cal.App.2d 103, 113 [127 P.2d 639].) A preponderance of the evidence only is required, and the fact finders may within reasonable limitations draw their own inferences from proven facts; also, they may reject alternative opinions while accepting the primary opinions of experts. (*Bedford* v. *Pacific S. W. Corp.,* 121 Cal.App. 162, 163 [8 P.2d 558]. ▆▆ Where the verdict of a jury is supported by any substantial evidence tending to establish the correctness of the facts determined the appellate court is powerless to reverse the judgment for insufficiency of the proof. (*Raggio* v. *Mallory,* 10 Cal.2d 723, 725 [76 P.2d 660]; *Patten & Davies Lbr. Co.* v. *McConville,* 219 Cal. 161 [25 P.2d 429].)

▆▆ Respondent's testimony that his finger was held under the influence of X-rays while being examined through a fluoroscope October 30, 1941; his immediate suffering with intense pain until December, 1942; the excision of the ulcer; the amputation of the finger; the pus-draining operation; the pain in his arm; confinement to the hospital; loss of power in his hand; his worry and anxiety—all warrant the finding that the sole and efficient cause of his injuries was the negligence of the physician who exposed his hand to the radiation, and that his general damage was reasonably the sum of $10,000.

Appellant complains that the diagnoses of Doctors Meland and Shelton were based upon false conditions. He asserts that the callus did not exfoliate and the ulcer appear in May but in August, 1942, as was proved at the trial; that respondent testified that he continued working and did not quit work as he had told Doctor Meland. The jury may have found that Dodds' memory was confused for he told Doctor Shelton that he "went back to work but the same (the wound) *continued* to be painful."

The argument that there is no proof that respondent received an X-ray burn was what appellant's counsel must have vainly argued to the jury. The contention that the operation of the X-ray machine with the X-ray tube below respondent's hand does not prove the presence of the energy, the *amount* of the voltage or amperage, or that respondent sustained a burn on October 30, 1941, comes with little force in the face of the jury's finding that the burn was received at the time and place and as testified by respondent.

The jury had the benefit of all discrepancies between respondent's testimony and his prior statements to the physicians. It is not material now that no witness testified to the number of Roentgen units to which the hand was exposed. It suffered a burn as a result of the October exposure, a trophic ulcer formed and respondent suffered. These are the facts which are established by the testimony. That the ulcer might have been caused by respondent's continuing to labor between November 1, 1941, and July 15, 1942, with his hand in a glove was a possibility rejected by the jury and by the trial court in denying a new trial. They chose to find that while the injured hand was exposed to an X-ray tube, with the machine running, the hand was burned; and four experts testified that in view of the history given the wound was caused by either radium or X-ray radiation. This is more than a scintilla of evidence. It is substantial proof.

■ Appellant invokes the rule that a party is bound by the recitals of documentary evidence introduced by him. (*Davenport* v. *Stratton,* 24 Cal.2d 232, 240 [149 P.2d 4] ; 20 Am.Jur. 771, § 915.) He then proceeds to demonstrate that certain statements in the work "X-Rays and Radium in the Treatment of the Skin," by McKee, introduced in evidence by respondent, are inconsistent with the diagnoses of the witnesses. The elaborate argument to illustrate the hopelessness of respondent's position by showing the inconsistencies between McKee's discussion of the symptoms of a third degree X-ray burn and the medical testimony is interesting but not convincing. It was the privilege if not the duty of respondent's counsel to offer in evidence the entire McKee volume at the time of reading any part of it. Conceding, arguendo, that it contains language contradictory of the expert witnesses, it is a rule governing appeals that where there is a conflict between the witnesses presented by a party or any inconsistency between his living witnesses and his documents, or be-

tween inferences drawn from the facts proved by either, the jury are at liberty to choose the writing or the witness or the inference upon which they will base their finding.

Appellant contends that it is impossible for the trophic ulcer to have been caused by the fluoroscope incident because the period of time between the exposure October 30, 1941, and the appearance of the ulcer in July of 1942 is too great. This contention is based upon McKee's opinion that the symptoms of a third-degree X-ray burn are as follows: "The patient usually feels a great deal of heat, feels quite hot within the next two or three days, sometimes the first night afterwards, and then redness of the skin is noted and the condition becomes worse. Finally the skin begins to peel off on the surface and the glands are destroyed; that is, they atrophy and the hair disappears and the skin becomes thin and eventually ulcerates." Nothing contained in the foregoing quotation is inconsistent with the development of respondent's trophic ulcer or with the language of the experts who testified that the symptoms indicate an X-ray burn. But if there were a contradiction the jury were privileged to ignore McKee and to base their finding upon the testimony of respondent as to the date of his exposure and his subsequent experience and upon the uniform opinions of the experts that the tissue of the ulcer was the result of an X-ray burn or was consistent with such a burn.

### Respondent's Injury the Sole Proximate Result of the X-Ray Burn

Respondent was first examined by Doctor Foster on August 14, 1942, and by Doctor Meland 17 days later. At the first visit Doctor Meland "discussed the advisability of an amputation of the finger . . . and told Mr. Dodds . . . that if the ulcer remained in the same condition the probable treatment would be amputation . . . that in my opinion . . . these palliative measures . . . would do absolutely no good excepting to relieve pain . . . that best treatment and the most certain way, and practically the only certain way of getting rid of pain . . . was to amputate the finger at once. . . . When I told him that he should submit to an amputation he told me, in substance, that he would rather let the thing go, and take a chance on whether there might be some improvement in the ulcer . . . at the time I first saw him I recommended the amputation of the entire finger to be sure that enough was

taken off to eliminate any possibility of any further trouble from the X-ray burn itself.'' Subsequent events narrated by Doctor Meland follow: September 14, 1942, respondent entered the hospital where drugs were for a time used without conquering the pain. These abortive attempts were followed by the excision. It was then found that while he had good blood supply and free bleeding, the ulcer had been infected before the operation. The application of sulfa drugs was tried but abandoned because of the allergic reaction, and the finger was amputated December 1, 1942. Thereafter the healing was slow; swelling appeared along the suture line and up the arm with redness of skin and a temperature. On January 7, 1943, Doctor Shelton joined Doctor Meland in advising respondent that an incision should be made in order to effect better drainage but the patient refused to submit to the operation then or at any time prior to his leaving the hospital. He was planning on going to a nationally known clinic. Almost daily the doctor observed the pain suffered and the slowness of the healing until respondent was discharged from the hospital February 10, 1943. On February 24 and March 26 he still suffered pain and there was thickening of the soft tissue on the latter date. An incision was made to effect better drainage to clear all infection. On May 20 a small callus had developed in the palm of his right hand, the precise cause of which was not determined. On June 15, 1943, there was tenderness over the stump where the skin adhered to the wound. The same condition appeared to obtain on December 29, 1943. On May 31, 1944, a neuroma* involved the scar. Such condition produced shooting pain on touch and at times without contact. March 13, 1945, the scar was still tender and pain was present in the two fingers adjacent to the stump and in the arm. The surgery performed by Doctor Shelton was good. On March 26, 1943, he submitted to the incision to improve the drainage, remove the infection and relieve the pain.

Whether respondent used due diligence in determining not to undergo the amputation or the incision when first suggested and acted as a prudent person should have acted under the circumstances was a question for the jury. (45 C.J. 1311.) From the testimony it is seen that respondent followed the advice of his physicians in all respects except two: (1) Delay-

*A small amount of scar tissue that collects at the end of a nerve that has been cut off and at times lies free in the tissues and at other times lies in the scar itself.

ing to have the amputation on September 1, 1942, and (2) to have the incision on January 7, 1943. Unquestionably the jury must have considered whether the attitude of respondent was one of refusal to follow the advice of his physicians or was, because of his extended experience, one of justifiable fear of want of their skill. Whether such delays under the circumstances were those of a reasonably prudent person determines the right of respondent to recover all of the special damages, and the implied finding was that respondent was not arbitrary in not promptly acceding to each suggestion of an operation.

The jury were evidently influenced by the following facts: (1) The physicians agreed about September 1, 1942, to use drugs that they might destroy the infection and remove the foul tissue. After two weeks of medicaments they advised excision of the ulcer. (2) They performed that operation September 14. They were encouraged then to believe that because of the free bleeding a grafting of new skin over the scar might be accomplished. (3) At no time during September, October or November, 1942, did either Doctor Shelton or Doctor Meland decline to treat respondent unless he would have the finger amputated. (4) At the first suggestion of amputation, September 1, 1942, no serious attempt had been made to treat the wound with drugs, which is the universal custom of dealing with chronic sores. (5) It was not an unreasonable preference to choose to keep the injured organ and in acceding to his wishes for two weeks the physicians gave their approval. (6) In hesitating to permit the incision on January 7, 1943, the jury were influenced by the facts that respondent had suffered one excision September 14, one amputation December 1, and one incision December 17, 1942. It was not unreasonable for respondent to entertain fears on January 7, 1943, that perhaps the removal of the pocket of pus by scraping his wound might not be the wise course to follow after the use of drugs and submitting to three operations. (7) His fears on January 7 were justified by the stubborn course of the wound following the incision on March 26, 1943. (8) At the time he was advised to submit to a second incision (January 7, 1943) he had no temperature.

While it is true that Doctor Shelton testified that he believed that by having amputation October 7, 1942, the period of respondent's hospitalization would have been materially abbreviated, yet in weighing the question of respondent's refusal to have the operation the jury had the exclusive right to

determine whether he was arbitrary or reasonable in his refusal. They could consider not only the eight facts above outlined but they could consider the uncertainty of medical opinion as frequently demonstrated. (See *Barham* v. *Widing,* 210 Cal. 206, 215 [291 P. 173].)

If the circumstances were such as to warrant the jury in finding that respondent exercised reasonable diligence in caring for his injury and used reasonable means to prevent its aggravation and to effect a complete cure, he was not obligated to undergo the amputation promptly when advised by his physician to do so solely because it might, by accomplishing a speedy healing of his wound, minimize the loss to be suffered by him whose negligence had caused the injury at first. (*Boa* v. *San Francisco-Oakland Terminal Railways,* 182 Cal. 93, 101 [187 P. 2].) Where the benefits to be gained by the refusal of a person who has been injured through the negligence of another to undergo a serious operation are doubtful, such refusal may be found not unreasonable even though such operation be advised by a competent physician. A plaintiff cannot be compelled to submit to an operation which would necessarily require the loss of a hand or a finger. This is especially true where the benefit to be derived from the operation is problematical and where therapeutic drugs have not already been tried. (See *Karberg* v. *Southern Pacific Co.,* 10 Cal.App.2d 234, 252 [52 P.2d 285] ; *Burns Case,* 298 Mass. 78 [9 N.E.2d 719, 720].)

Appellant cites *Stahura* v. *Industrial Commission,* 103 Colo. 451 [86 P.2d 1080], and *Overton* v. *City and County of Denver,* 106 Colo. 114 [102 P.2d 474], both by the Supreme Court of Colorado on reviewing and *affirming* findings of the Industrial Commission. The effect of the holding in each case was a determination by the commission that the refusal to submit to the advised operation under the circumstances was negligence and that the applicant should be denied compensation for the time lost by his refusal to allow the operation. In *Western Shade Cloth Co.* v. *Industrial Commission,* 308 Ill. 554 [140 N.E. 45, 46], the Illinois court held that from the "character of the evidence" the advice of the doctors should have been followed, and that if the applicant had accepted their advice and taken the treatments the injury would not have been as serious as it turned out to be.

In *Southern California Edison Co.* v. *Industrial Acc. Com.,* 75 Cal.App. 709 [243 P. 455], the company had offered to pro-

vide and had urged and recommended an operation pursuant to medical advice but from the outset the applicant refused to consent to such operation. Such facts bear no resemblance to those here involved where respondent's wish to avoid loss of the injured member was respected by both physician and surgeon who cooperated by the use of drugs and by excision of the ulcer and who were at the time of opinion that a grafting operation might succeed.

Basing his contention upon the hypothesis that respondent's refusal to submit to an amputation of his finger on September 1, 1942, resulted in the extension of his pain and suffering, his confinement to the hospital and absence from his work as well as in the enlargement of the hospital and medical charges, appellant contends that all losses suffered after November 1, 1942, should have been disallowed and that the judgment should be reversed by reason thereof. By reason of the evidence as above outlined and of the absence of any direct proof that respondent's expressed desire to defer the amputation was the cause of his losses after November 1, 1942, it cannot be said that the jury failed to exercise a reasonable discretion in impliedly finding that he justifiably deferred the amputation of his finger on September 1, 1942, and the incision on January 7, 1943.

### No Excessive Damages

■ It cannot be said as a matter of law that the damages awarded were excessive in view of the pain and losses suffered and of the currently deflated value of the dollar. (*Butler* v. *Allen,* 73 Cal.App.2d 866, 870 [167 P.2d 488].) The power of the appellate court over excessive damages is invoked only when the facts are such that the excess appears as a matter of law or is such as to suggest, at first blush, passion, prejudice or corruption. (*Wiezorek* v. *Ferris,* 176 Cal. 353, 358 [167 P. 234].) When a trial court has refused to set aside a verdict on the ground that it is excessive it is the established rule that the verdict must stand unless it greatly exceeds a reasonable sum that might be fixed by enlightened men of sober judgment as reasonable compensation for the injuries suffered by the plaintiff in his situation at the time of and after the injury. If a verdict approved by the trial court does not shock the sense of justice and immediately induce a belief that the award was prompted by prejudice, passion or corruption, then the appellate court should not disturb the judgment.

(*Kyer* v. *McComber*, 12 Cal.2d 175, 182 [82 P.2d 941] ; *Dreyer* v. *Cyriacks*, 112 Cal.App. 279, 283 [297 P. 35].) The evidence of appellant's negligence and of respondent's long suffering and anxieties speak volumes for the general damages awarded.

### No Prejudice in Giving or Refusing Instructions

Many instructions given by the court are criticized as prejudicial without supplying references to the transcript. In fact the page on which a criticized instruction is found is specified in one instance only and that instruction is as follows :

''The issue to be determined in this case is whether or not the plaintiff sustained an X-ray burn on or about October 30, 1941, at the First Aid hospital on the premises of the California Shipbuilding Corporation. The burden is upon the plaintiff to prove by a preponderance of the evidence that he sustained an X-ray burn at the place and at or about the time stated. If you find that he did not sustain such a burn at or about said time and place, then the plaintiff is not entitled to recover. If you find that the plaintiff did sustain an X-ray burn at that time and place, you will find what damages plaintiff has suffered as a proximate result thereof and return a verdict in his favor for the amount of such damage. As indicated in this instruction, you should determine the question of liability before you undertake to fix any amount that would compensate for the damage if any as found to be suffered. Whenever in these instructions, I state that the burden or the burden of proof rests upon a certain party to prove a certain allegation by him, the meaning of such an instruction is that unless the truth of that allegation is proved by a preponderance of the evidence, you shall find the same to be not true.''

Of the foregoing appellant says that ''the stipulation that if respondent sustained an X-ray burn on or about October 30, 1941, the individual causing the burn was unskillful or negligent and was a servant of defendant Stellar . . . merely relieved plaintiff of the burden of proving . . . that the individual responsible therefor was a servant of the defendant Stellar. The trial judge erroneously assumed that the stipulation relieved the plaintiff of his burden to prove that he sustained an X-ray burn of the kind and nature alleged. . . .''

Also, he says the instruction ignored the proposition that plaintiff was under the burden of proving by a preponderance of evidence that his pain, trophic ulcer and the loss of his

finger were the proximate result of roentgen dermatitis and first, second and third degree burns as alleged. He argues that the instruction was a formula instruction and requires a reversal of the judgment. It bears no resemblance to a formula instruction but if it should offend in such respect it will be observed that the rigid rules formerly applicable to formula instructions have been generously modified in recent years and that where the omitted matter has been fully, fairly and correctly covered by the court's charge and it is obvious that the jury was not misdirected, the omission of a substantial factor is not prejudicial. (*Dawson* v. *Boyd*, 61 Cal.App.2d 471, 483 [143 P.2d 373].)

Appellant asserts that the quoted instruction overlooks his defense of contributory negligence arising from respondent's neglecting to quit work and have his hand treated. But the court instructed the jury that in deciding whether there was negligence in a given case "the conduct must be considered in the light of all the surrounding circumstances as shown by the evidence"; that "the proximate cause of an injury is the cause which . . . produces the injury . . ."; that there may be two efficient causes; "whether proximate cause has been proved by a preponderance of the evidence, you should consider all the evidence . . . ; any general damage or any item of special damage which the preponderance of evidence shows was a proximate result of any negligence on the part of the plaintiff cannot be included in any verdict you might render in favor of the plaintiff." The merits of one instruction cannot be fairly appraised by lifting it for analysis from the court's entire charge.

Referring to another instruction appellant complains that the court unduly minimized the vice of failure of recollection of a witness. The instruction upon the measure of credibility and discrepancies in a witness' testimony does not vitally differ from the customary instruction upon that subject. While "failure of recollection is a common experience and innocent misrecollection is not uncommon" might be regarded as a gratuitous observation, it is nevertheless a truism and is harmless. No authority is known that denounces such a comment as prejudicial.

While the customary form of telling the jury that they are "the exclusive judges of all questions of fact" was not used, still no prejudice can result from a slight variation in the language of the admonition. The court below told the

jury "you are to decide this case solely upon the evidence received and the inference you may reasonably draw therefrom and such presumption as the law deduces therefrom," and "if during this trial I have said or done anything which has suggested to you that I am inclined to favor the claims or position of either party do not suffer yourselves to be influenced by any such suggestions. . . . If any expression of mine has seemed to indicate an opinion relating to any of these matters, I instruct you to disregard it. . . . You shall not consider as evidence any statement of counsel made during the trial unless such statement was made as an admission . . . of a fact." Such language left no doubt of the court's meaning that the jury were exclusively to judge the facts in evidence. That they should determine the credibility of the witnesses is shown by the instruction commencing: "In judging the credibility of a witness you shall . . ." This was followed by ten rules to be observed in appraising the value of a witness.

 Assignment is made of the instruction to view with distrust weaker evidence offered by a party if the jury should find it was within the power of a party to produce stronger evidence, which appellant says was given at the request of respondent. No reference is made to any part of the record to show that respondent suggested it. Since it is not shown to have been requested by respondent it must be presumed to have been suggested by appellant, (*Cleveland* v. *Petrusich,* 117 Cal.App. 71, 82 [3 P.2d 384]; 24 Cal.Jur. § 118, p. 871, note 10; 2 Cal.Jur. § 509, p. 870, note 5) and therefore cannot constitute cause for reversal. In any event, the criticized instruction did not authorize the jury to reject anything. Taken as a whole it directed the jury to consider all the evidence before determining whether respondent received a third degree burn and whether the trophic ulcer was caused by the burn or by a trauma while respondent worked at the shipyards.

 Appellant contends with fervor that the same instruction permitted the jury to reject the testimony of Doctor Meland that an amputation on August 31, 1942, was imperative as the only available cure, and the opinion of Doctor Shelton that respondent's refusal of an amputation on October 9, 1942, was contributory negligence. Nothing is noted either in the court's language or in the testimony to justify such an attack. Not only does the testimony of both physicians substantially

reproduced herein show that neither insisted upon amputation when it was first suggested but it reveals that both believed that the ulcer might be supplanted by a grafting operation; that both collaborated to that end, and also that respondent submitted to the operation on the day specified for that undertaking. The jury were instructed that it was respondent's duty "to use the amount of care . . . exercised under the same circumstances by an ordinarily prudent person in order to avoid, if reasonably possible, any aggravation of the original injury; if an injured person fails to use such amount of care and such, if any, failure proximately contributes in any degree whatever to an aggravation of the original injury, then such person is not entitled to recover damages for such aggravation. . . ." The two physicians testified for respondent and supported his testimony that he received his X-ray burn at appellant's office October 30, 1941. Because they admitted that other causes may produce a trophic ulcer did not automatically strike all of their other testimony. The jury were so instructed that they might have determined that the ulcer was or was not caused by X-ray burn, or that it was caused by a trauma.

Appellant's extended defense of the testimony of the two physicians as being "entitled to full credit" is grave support for the jury's implied finding that the ulcer was caused by an X-ray burn.

 Assignment is made of the following instruction as prejudicial:

"If under the instructions you should find that the plaintiff is entitled to a verdict, in arriving at the amount of the award you shall determine each of the items of claimed detriment which I am about to mention, provided, that you find it to have been suffered by him as *a* proximate result of the sustaining by plaintiff of an X-ray burn at the first-aid hospital on the premises of California Shipbuilding Corporation on or about October 30, 1941. . . ."

It is urged that the jurors were not cautioned in this or succeeding instructions that they could not include the entire cost of the services of physicians, and the entire value of time lost, in the total sum which would compensate for disfigurement, pain, discomfort and anxiety past and present. Such caution was unnecessary. The court's charge defined the two kinds of damages and specified the items constituting each.

██ Concerning the same instruction appellant stresses the use of "a" before proximate result instead of "the" as having the effect of relieving respondent of his share in causing his losses by aggravating the burn. He cites in support of such contention *Hellman* v. *Los Angeles Railway Corp.*, 135 Cal.App. 627, 645 [27 P.2d 946, 28 P.2d 384], and *Dieterle* v. *Yellow Cab Co.*, 53 Cal.App.2d 691, 694 [128 P.2d 132]. In the Hellman case the court said in the very passage quoted by appellant that "If such instruction stood alone we would . . . declare it to be prejudicially erroneous." In the Dieterle case the appellants contended that the issue was changed by the use of "a" in an instruction before proximate cause instead of "the." In that case the question of concurrent negligence in causing the original injuries was an issue. In the case at bar there was no contributory negligence pleaded or urged as cause for the X-ray burn, but reliance is placed upon the failure of respondent to avoid aggravating the injury. This was properly covered by the court's instruction heretofore cited. The instructions as a whole advised the jury concerning the X-ray exposure of October 30, 1941, and directed them that a person injured "through the fault of another is bound to use the amount of care which would have been exercised under the same circumstances by an ordinarily prudent person in order to avoid, if reasonably possible, any aggravation of the original injury; if an injured person fails to use such amount of care and such, if any, failure proximately contributes in any degree whatever to an aggravation of the original injury, then such person is not entitled to recover damages for such aggravation, but is only entitled to recover damages for that portion of the pain or disability which is proximately caused by the original injury, unaffected by such, if any, aggravation thereof." This instruction made clear the issue presented by appellant's contention before the jury. Since the jury are presumed to have understood it and to have acted upon it, the criticized instruction could have had no influence in deflecting the jury's attention from the law given with respect to aggravation of injuries. In this connection it may be repeated that inasmuch as appellant has not pointed to any proof that respondent offered the criticized instruction it is presumed that it was the product of appellant's counsel. (*Cleveland* v. *Petrusich, supra.*)

██ Appellant requested the court to read 16 instructions of his own invention and 26 from Baji (California Jury In-

structions) and now complains that they were not all read to the jury. In the light of the record such a procedure would have been gross error if not calamitous, and cannot be commended as rendering aid to a court whose duty is to simplify the task of the jury rather than to make it more difficult. The 16 prepared instructions are in the main repetitious and argumentative and could have served no purpose but to confuse. With respect to the 26 Baji instructions, appellant says in his brief: ''The court refused to give this group of instructions. (1, 2, 3, 4, 5, 6, 7, 8, 9, 21, 21b, 22, 22a, 23, 24, 25, 26, 27, 33, 101, 102, 103, 104, 104-a, 132, 136; also 133, after omitting negligence in the first line and the last sentence.) It selected some of them and refused to give the others. This request on the part of the defendant Stellar was not a request that the court single out certain of the Baji instructions contained in the group. It was a request that the court either give the group of instructions from Baji as requested or refuse to give said instructions as specified in the request.'' A novel demand indeed! The court properly incorporated such of the 26 Baji instructions as it deemed necessary. That some of those rejected might have been as desirable as those selected does not constitute prejudice. Baji 24, with respect to not being obliged to decide ''in conformity with the testimony of a number of witnesses which does not produce conviction,'' etc., is an approved instruction. (See *Huddy* v. *Chronicle Publishing Co.,* 15 Cal.2d 554, 568 [103 P.2d 421].) Baji 22 is matter briefly but effectively covered in the court's charge.

Without further discussion of appellant's specious criticisms of the instructions and of the rejection of those offered it is sufficient to say that upon an examination of the entire cause including the evidence this court is persuaded that no instruction given or refused resulted in a miscarriage of justice and that therefore the judgment cannot be reversed. (Const., art. VI, § 4½.)

Judgment affirmed.

McComb, J., and Wilson, J., concurred.

A petition for a rehearing was denied January 21, 1947.