Filed 1/23/15

<u>**CERTIFIED FOR PUBLICATION**</u>

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| MOHAMAD HARB et al., <br><br> Plaintiffs and Appellants, <br><br> v. <br><br> CITY OF BAKERSFIELD et al., <br><br> Defendants and Respondents. | F066839 <br><br> (Super. Ct. No. CV265887) <br><br> **OPINION** |

APPEAL from judgment of the Superior Court of Kern County.  Eric Bradshaw, Judge.

Law Offices of Young & Nichols, Steve W. Nichols, Thomas A. Brill; The Ehrlich Law Firm and Jeffrey Isaac Ehrlich for Plaintiffs and Appellants.

Marderosian, Cercone & Cohen, Michael G. Marderosian and Heather S. Cohen for Defendants and Respondents City of Bakersfield, Bakersfield Police Department and Claudia Payne.

Borton Petrini, James J. Braze; Jones & Dyer, Gregory F. Dyer and Scott H. Cavanaugh for Defendants and Respondents Hall Ambulance Service, Inc., and Brian Dumont.

-ooOoo-

Mohamad Harb, M.D. was driving home from his shift at Kern Medical Center's neonatal intensive care unit when he suffered a stroke and drove his car onto a sidewalk. The police officer who arrived at the scene did not call an ambulance immediately because she deduced from Dr. Harb's vomiting, slurred speech and disorientation that he was intoxicated and, after a struggle, placed him in handcuffs. The first ambulance that arrived on the scene left without Dr. Harb. Later, a second ambulance took Dr. Harb to a hospital where he received treatment and survived, but the brain damage he suffered rendered him unable to care for himself.

Harb and his wife sued the City of Bakersfield (City), the responding officer, the ambulance company, and the paramedic who drove the first ambulance. They alleged the defendants' delay in getting Harb medical treatment made the consequences of his stroke much worse. The case was tried to a jury, which returned a defense verdict. Plaintiffs appealed, contending the jury instructions contained two errors.

First, plaintiffs argue a police immunity instruction (an officer is not liable if exercising due care) should not have been given because it used confusing language and, moreover, was unnecessary in a negligence case. We agree. While the immunity instruction was a correct statement of the law in the abstract, it was unnecessary because plaintiffs were already required to prove the police officer acted negligently. Also, the instruction's use of the phrase "exercising due care" without defining it, and without explaining how the due care standard related to the reasonable care standard in the negligence instructions, created an ambiguity. Based on the record before us, there was a reasonable likelihood the police immunity instruction misled the jurors because it is unlikely the jurors would have understood there was no immunity for a police officer who acted negligently.

Second, plaintiffs contend the jury should not have been instructed on comparative negligence because Harb's alleged negligent failure to manage his high blood pressure

2

occurred before the accident and the defendants' interaction with him. Plaintiffs contend any preaccident negligence by Harb was irrelevant because (1) a tortfeasor takes the plaintiff as she finds him and (2) plaintiffs were not seeking to recover damages caused by the stroke, only damages resulting from the delay in treatment caused by the defendants. Whether a plaintiff's preaccident negligence is a type of comparative fault under California law appears to be a question of first impression. We conclude that, where a plaintiff is seeking damages only for the aggravation or enhancement of an injury or condition, California will follow the majority view that a plaintiff's preaccident conduct cannot constitute comparative negligence when that conduct merely triggers the occasion for aid or medical attention. As a result, defendants who render aid or medical attention cannot reduce their liability for the harm resulting from their tortious acts and omissions by attributing fault to the plaintiff for causing the injury or condition in the first place.

Under the facts of this case, the jury should not have been instructed on comparative negligence and defendants should not have been allowed to argue Harb's neglect of his high blood pressure was comparative negligence that rendered him responsible for all of the harm suffered.

We also conclude the errors in the instructions were prejudicial.

Therefore, the judgment is reversed and the matter remanded for a new trial.

## FACTS

On November 24, 2007, Harb completed a 12-hour shift at Kern Medical Center's neonatal intensive care unit. While driving home, Harb suffered a hemorrhagic stroke. A defense expert described the event as "an intracerebral hemorrhage into the substance of his brain."[1]

---

[1] The defense expert stated an intracerebral hemorrhage was not a blocked artery (i.e., an infarction), but an exploded artery that sprays blood under high pressure into the

3

As a result of the hemorrhage, Harb drove his car over a curb and halfway onto the sidewalk. The impact with the curb twisted the right front wheel, bent the tire rims and caused the right front tire to go flat. A sales manager at a nearby used car dealership phoned 911 and reported the accident.

At 6:55 p.m., the 911 operators dispatched Bakersfield Police Officer Claudia Payne to the scene, advising her of a noninjury collision that involved a "possible driving-under-the-influence driver." At 6:58 p.m., Officer Payne arrived at the scene by herself. Near the time Officer Payne arrived, Harb vomited, but she did not see it. Two other officers arrived about a minute later.

Officer Payne first spoke with the sales manager who had made the 911 call. The sales manager told her that Harb had exited the vehicle, urinated on the sidewalk, returned to the vehicle and appeared to be attempting to leave. The sale manager had spoken with Harb to delay him until the police arrived.

Officer Payne then spoke with Harb, saw a wet spot on his medical scrubs directly below his chin, noted he was disoriented and asked for his car keys. Harb refused her request and attempted to place the key in the ignition. Officer Payne opened the driver's door and, holding Harb by the arm, brought him around the back of the car to the curb. Officer Payne did not detect the odor of alcohol on Harb's breath and did not notice any redness or watering in his eyes.

Officer Payne directed Harb to sit on the curb behind his car and then sat down with him. A struggle developed when Officer Payne attempted to handcuff him. When Officers Galland and Arms arrived at the scene, Officer Galland saw the struggle and he and Officer Arms ran to assist Officer Payne in cuffing Harb's hand behind his back. It

---

substance of the brain and creates a cavity or hole in the brain that results in permanent and irreversible brain damage.

4

took all three officers to get the handcuffs on Harb. Officer Galland testified that he was not aware of Harb hitting his head during the struggle, but at some point noticed a small bump on the right side of Harb's head.

At 7:10 p.m., Officer Payne called for an ambulance. Four minutes later, Brian Dumont, a paramedic and employee of Hall Ambulance Service, Inc., arrived at the scene in an ambulance with Darcy Smith, an emergency medical technician (EMT), and Lori Thomas, a trainee.

Paramedic Dumont checked Harb's condition by testing his blood glucose and taking his blood pressure. Harb's blood glucose was within the normal range and his blood pressure was slightly high, which Dumont did not consider unusual under the circumstances. Dumont asked Harb questions and received responses that were confused. Consequently, Dumont described Harb as having an "[a]ltered level of consciousness." Dumont also performed a Glasgow Coma Scale[2] test and gave Harb a score of 14 out of 15 possible points, deducting one point for Harb's speech.

Paramedic Dumont testified he saw the police conduct two alcohol breath tests on Harb at the scene and both tests results were 0.00. After the first test, a male officer said, "The machine must be wrong." After the second test, one of the officers said that Harb was probably on drugs.

Exactly what happened after Paramedic Dumont completed his assessment of Harb is the subject of conflicting testimony. The police officers testified that Paramedic Dumont told them that "[t]here is nothing medically wrong with this guy" and then packed up his gear, rolled the gurney back into the ambulance, closed the doors and left.

---

[2] The Glasgow Coma Scale is used to grade degrees of brain impairment. (*People v. Delgado* (2013) 213 Cal.App.4th 660, 664.) The patient's ability to open and move his eyes is rated on a scale of one to four, speech is rated on a scale of one to five, and motor control is rated on a scale of one to six. The lowest aggregate score of three would mean the person was totally comatose or dead. (*Ibid.*)

In contrast, Paramedic Dumont testified he told the officers that the ambulance crew would be transporting Harb to Kern Medical Center, a male officer asked why, and Dumont told him it was because Harb needed to go to the hospital. Dumont testified he informed the officers that Harb was not drunk and he did not find anything to indicate Harb was on drugs; he then told the officers that Harb needed to be transported right away. Dumont testified that (1) Officer Payne told him that the police would transport Harb, (2) he asked Officer Payne if she was taking Harb to jail or to the hospital to be evaluated, and (3) Officer Payne told him that she would take Harb to the hospital.

At 7:24 p.m., the first ambulance left the scene without Harb.

At about 7:27 p.m., Detective Blaine Smith and Officer David Cox arrived at the scene. They were assigned to DUI's and Officer Payne had phoned Detective Smith to ask for assistance. Detective Smith spoke with Harb, trying to assess his condition. After doing his assessment, Detective Smith told the other officers, "He's got some medical issues going on, and we need to get him in an ambulance. He needs to go to the hospital."

Around the time Detective Smith arrived, Meghan Coffey, a registered nurse from Kern Medical Center who had worked with Harb that day, drove by the accident scene. She saw a man sitting on the curb with his hands handcuffed behind his back, his right shoe off, and vomit on his face and down his shirt. She recognized the man as Harb and stopped her car. She told a police officer that Harb had been working at the hospital all day and that she thought something was wrong. She spoke with Harb and asked the police how he had gotten a gash on his forehead. A female officer told Nurse Coffey that it had happened when they were putting him in handcuffs and he was trying to fight them. Nurse Coffey told the officers that something was wrong with Harb, he needed to get to a hospital and they should call an ambulance. At Nurse Coffey's request, the police removed Harb's handcuffs.

6

At about 7:30 p.m., a registered nurse at the neonatal intensive care unit phoned Harb's cell phone to report on the blood oxygen level of a baby that was not doing well. A male police officer answered Harb's cell phone, informed the nurse that Harb was there and acting strangely, and asked her if Harb could be drunk. The nurse told the officer that Harb was on call and was not drunk. The nurse also told the officer that she believed Harb had had a stroke a few years ago. The officer relayed that information to the other officers.

At 7:31 p.m., the police called for a second ambulance, which arrived in seven minutes.

Detective Smith, who had been told an ambulance had come and gone, was upset when the second ambulance arrived because he thought they were the same ambulance crew. He yelled at them, "Hey, you guys should have never left." Someone told Detective Smith it was not the same crew.

Nurse Coffey testified that when the driver of the second ambulance asked why the first unit left, Officer Payne said, "It's on me. I sent them away. He's going with us." Officer Payne testified that she said, "That's on me." But, she denied saying that she had sent them away.

Officer Galland testified that by the time the second ambulance arrived, Harb's condition looked worse because he was paler, the right side of his face was starting to droop, and he was drooling a little. Harb had walked normally when he was walked back from his car to the curb, but he was shuffling and dragging his right side when he was taken to the second ambulance.

At 7:44 p.m., the second ambulance left the scene to take Harb to the hospital.

At 7:58 p.m., the ambulance arrived at Kern Medical Center and Harb was taken to a trauma room. Harb was first seen by a physician at 8:04 p.m. The emergency room doctor testified that Harb looked like somebody who was having an acute stroke. At 8:29

7

p.m., Harb was checked in for his first CT scan, which showed an extensive bleed—that is, a large amount of blood in the brain. After the CT scan, Harb's condition deteriorated. He stopped speaking English and tried to climb out of the gurney. The CT scan showed bruising around the blood pooling in his brain. The bruising caused swelling, which shifted the midline of the brain and compressed the brain. At around 9:00 p.m., Harb was given Labetalol, a hypertension medication, intravenously. Further medication was given and a second CT scan was taken around 10:30 p.m.

At 10:50 p.m., almost four hours after the 911 call, Harb was taken into an operating room for surgery.

Harb survived the surgery and was moved to a convalescent facility. A certified nurse assistant now provides care to Harb on a daily basis. The care includes bathing him, dressing him, brushing his teeth, combing his hair, and pushing him around in a wheelchair. Harb is able to feed himself, but if any food needs to be cut the certified nurse assistant cuts it for him. He wears diapers and needs help to get from the wheelchair to the commode.

## PROCEEDINGS

In December 2008, plaintiffs filed a complaint against City, Hall Ambulance, Officer Payne and Paramedic Dumont (collectively, defendants). In their fourth amended complaint, the operative pleading, plaintiffs alleged that City, Officer Payne, Hall Ambulance and Paramedic Dumont did not transport Harb to the hospital quickly enough after his stroke.

The jury trial began in November 2012. The emergency room doctor who treated Harb testified that he had discussed with plaintiffs' attorney the competing theories as to whether the delay in getting Harb to the hospital affected the amount of brain damage Harb suffered. The doctor stated his opinion was that the delay was adverse, but his opinion would not be as valuable as the neurosurgeon's.

8

A neurosurgeon retained by plaintiffs, Cary David Alberstone, M.D., testified that if Harb had received blood pressure medication earlier, it would have stopped the bleeding earlier, reduced the size of the hematoma,[3] and reduced the ultimate neurological deficits. He stated that if Harb had received the medication given at 9:00 p.m. before he deteriorated at 8:45 p.m., the degree of damage caused by the bleed would have been lessened.

In contrast, the neurosurgeon retained by City, Thomas Hoyt, M.D., testified that the bleeding inside Harb's brain stopped after two heartbeats because the blood vessel clotted off and the back pressure from the blood clot slowed and stopped the bleeding. He stated the blood clot addressed during Harb's surgery occurred before defendants were involved with Harb. Dr. Hoyt also testified that there were only two possible outcomes for Harb at the time the hemorrhage occurred—death or the condition Harb was in at the time of trial.

On December 11, 2012, the jury was instructed on the law by the trial court and heard closing arguments from counsel. Counsel representing City asserted Harb was contributorily negligent based on the evidence about his failure to take blood pressure medication. Counsel for City argued "Harb gambled with his own life.… He owns all of the responsibility here as to what happened." He also argued the "outcome was determined at the time [Harb] suffered that stroke that night."

During their deliberations, the jury asked to hear the testimony of Paramedic Dumont again and, as a result, the court reporter read that testimony to the jury. At around 3:00 p.m. on December 12, 2012, the jury reached a verdict.

---

**3**      A collection of blood outside the blood vessels (i.e., the pool of blood inside Harb's brain).

The first question in the special verdict form asked whether Officer Payne and City were negligent. The jury answered, "No." The third question in the special verdict form asked whether Paramedic Dumont and Hall Ambulance were grossly negligent. The jury answered, "No." In accordance with the instructions in the special verdict form, the jury did not answer any other questions.

On December 13, 2012, a judgment on special verdict was filed. It stated plaintiffs would take nothing by way of their complaint against defendants.

Plaintiffs filed a motion for new trial that asserted the trial court erred in allowing defendants to pursue the theory that Harb's own negligence was a cause of the stroke and thus contributed to his injuries. Plaintiffs argued that any prestroke negligence by Harb was irrelevant because plaintiffs were seeking damages only for the additional injuries Harb suffered as a result of the delay in treatment, not for any injuries suffered in the stroke itself. The motion also asserted the trial court erred in giving a jury instruction on police immunity that tracked the text of Government Code section 820.4.[4]

Plaintiffs supported their motion for new trial by submitting declarations from four jurors. The trial court struck one declaration in its entirety and the paragraphs in the other three declarations that described what "the jury collectively believed .…" The court did not strike the paragraph in each of the three declarations that stated (1) the jurors discussed the jury instruction stating a police officer is not liable for his act or omission, exercising due care, in the execution or enforcement of any law and (2) "I verbally agreed that this instruction did not permit us to find negligence on the part of defendants [Officer] Payne and the City of Bakersfield."

---

[4]     The text of the challenged jury instructions is set forth in part III.A. (police immunity) and part IV.A. (contributory negligence), *post*.

In February 2013, the trial court issued a minute order denying plaintiffs' motion for new trial.

Plaintiffs appealed from the judgment.

## DISCUSSION

I.     ADEQUACY OF APPELLATE RECORD

    A.    <u>Contentions of the Parties</u>

Hall Ambulance contends this court should not address plaintiffs' claims of instructional error because plaintiffs failed to provide a complete set of jury instructions in their appellants' appendix.

Similarly, City argues plaintiffs' failure to include and present all of the jury instructions to this court is fatal to their appeal.

Plaintiffs contend the defendants have misrepresented the contents of the appellate record, which contains a reporter's transcript that includes (1) all of the instructions read to the jury and (2) plaintiffs' objections to the jury instructions given.

    B.    <u>Scope of Reporter's Transcript</u>

We have reviewed volume 21 of the reporter's transcript and it includes all of the jury instructions that the trial court read to the jury before counsel's closing arguments. The reporter's transcript also includes the court's instructions to the jury after counsel's closing arguments.

Therefore, defendants' claim that the record is incomplete because it does not include all the instructions given to the jury is inaccurate. Furthermore, the claim that the record is incomplete because it does not contain the instructions requested but not given is unpersuasive because there has been no showing that the rejected instructions have any bearing on the issues raised by plaintiffs. Consequently, we will consider the merits of plaintiffs' claims of instructional error. (See *Ballard v. Uribe* (1986) 41 Cal.3d 564, 574 [appellant must provide an adequate record of lower court's proceedings].)

11

II.     APPELLATE REVIEW OF JURY INSTRUCTIONS

      A.     Independent Review

Appellate courts apply a de novo standard of review when determining whether the trial court's jury instructions were proper because the propriety of a jury instruction is a question of law.  (*Ford v. Polaris Industries, Inc.* (2006) 139 Cal.App.4th 755, 766; 3 Wegner, et al., Cal. Practice Guide: Civil Trials and Evidence (The Rutter Group 2014) ¶ 14:254, p. 14-59.)

      B.     Prejudice Resulting from Instructional Error

In addition to showing an instructional error occurred, an appellant must establish the error was prejudicial.  (*Adams v. MHC Colony Park, L.P.* (2014) 224 Cal.App.4th 601, 613.)

Article VI, section 13 of the California Constitution provides:  "No judgment shall be set aside, or a new trial granted, in any cause, on the ground of misdirection of the jury … unless, after an examination of the entire cause, including the evidence, the court shall be of the opinion that the error complained of has resulted in a miscarriage of justice."[5]

The "'miscarriage of justice'" phrase has been interpreted to prohibit a reversal unless there is "a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached."  (*Soule v. General Motors Corp.* (1994) 8 Cal.4th 548, 574 (*Soule*).)  Thus, when challenging the jury instructions given in a civil case, the appellant must show it was "reasonably probable the jury would

---

[5]     Similarly, instructional error is addressed in Code of Civil Procedure section 475, which states:  "No judgment … shall be reversed … by reason of any … instruction, … unless it shall appear from the record that such … instruction … was prejudicial, and also that by reason of such … instruction, … the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such … instruction … had not occurred or existed."

have returned a more favorable verdict." (*Holmes v. Petrovich Development Co., LLC* (2011) 191 Cal.App.4th 1047, 1073.)

In the context of assessing prejudice from instructional error, the constitutional requirement for "an examination of the entire cause" (Cal. Const., art. VI, § 13) has been interpreted to mean courts should consider, insofar as relevant, (1) the degree of conflict in the evidence on the critical issues; (2) whether the winning side's argument to the jury may have contributed to the instruction's misleading effect; (3) whether the jury requested rereading of the erroneous instruction or related evidence; (4) the closeness of the jury's verdict; and (5) the effect of other instructions in remedying the error. (*Soule*, *supra*, 8 Cal.4th at pp. 570-571.) In other words, the assessment "requires evaluation of several factors, including the evidence, counsel's arguments, the effect of other instructions, and any indication by the jury itself that it was misled." (*Id.* at p. 574.)

III. POLICE IMMUNITY INSTRUCTION

A. Contents of the Instruction

The trial court read special jury instruction No. 5 to the jury after an instruction about the authority of public safety officials to manage the scene of an emergency. The special instruction stated: "A police officer is not liable for his act or omission, exercising due care, in the execution or enforcement of any law."

The instruction was based on Government Code section 820.4, which provides: "A public employee is not liable for his act or omission, exercising due care, in the execution or enforcement of any law. Nothing in this section exonerates a public employee from liability for false arrest or false imprisonment."

Counsel for plaintiffs objected to the instruction on the ground the instruction did not apply to a negligence cause of action, which was the theory of liability pursued against City and Officer Payne.

13

B.    Theory of Instructional Error

1.    *Contentions*

Plaintiffs contend there was no reason for the jury to be given an instruction regarding Government Code section 820.4 because if the jury found Officer Payne was not negligent, the statute would be irrelevant because she would have no liability. Conversely, if the jury found Officer Payne was negligent, then the statute would be irrelevant because she could not have qualified for its protections.  Plaintiffs also argue:

> "The instruction's awkward wording compounded the problem. Even when a statute applies to the facts of a case, its literal text should only be used in an instruction if its meaning would be obvious to laypeople. (*People v. Thomas* (1945) 25 Cal.2d 880, 895-896.)  That can hardly be said of [Government Code s]ection 820.4.

> "The statute is phrased in the negative; i.e., it describes when officers may *not* be held liable.  This means that the instruction directed a defense verdict—unless the jurors independently recognized that it described an immunity with no effect in negligence lawsuits.  That is not a reasonable demand to make of laypeople.  'The jury can hardly be aware that [t]his instruction, formally declared by the court as the law applicable to the case, is irrelevant.'  (*People v. Albertson* (1944) 23 Cal.2d 550, 588 (Traynor, J., concurring).)"

In effect, plaintiffs contend the police immunity instruction was both superfluous and ambiguous.

2.    *Rules of Law Defining Errors in Instructions*

There are many types of instructional errors recognized by California courts. Instructions that misstate the substantive law, the rules of evidence, or the duties of the judge and jury are a major source of reversal in instructional error cases.  (7 Witkin, Cal. Procedure (5th ed. 2008) Trial, § 305 [errors in content].)

In addition, "it is improper to give an instruction which lacks support in the evidence, even if the instruction correctly states the law.  [Citation.]" (*LeMons v. Regents of University of California* (1978) 21 Cal.3d 869, 875.)  In other words, "[a]n instruction

14

correct in the abstract, may not be given where it is not supported by the evidence or is likely to mislead the jury. [Citation.]" (*Joyce v. Simi Valley Unified School Dist.* (2003) 110 Cal.App.4th 292, 303.)

The concern about misleading the jury also applies to ambiguously worded jury instructions. When a jury instruction is challenged on the ground it is ambiguous, the test is whether there is a reasonable likelihood that the jury misunderstood and misapplied the instruction. (*Collins v. Navistar, Inc.* (2013) 214 Cal.App.4th 1486, 1500.)

### 3. Correct, but Redundant

Initially, there is no question that, in the abstract, the police immunity instruction correctly stated the law because its wording tracked the language in the first sentence of Government Code section 820.4.

Furthermore, there is no doubt the instruction was redundant to the jury instruction stating plaintiffs were required to prove Officer Payne was negligent. Government Code section 820.4 refers to a public employee "exercising due care." The California Supreme Court interpreted the statute as declaring "immunity for public employees for their *non-negligent* acts 'in the execution or enforcement of any law' …." (*Sullivan v. County of Los Angeles* (1974) 12 Cal.3d 710, 717, italics added.) In other words, "exercising due care" for purposes of Government Code section 820.4 refers to acts and omissions by a public employee that are not negligent.

Therefore, the police immunity instruction was redundant to the negligence instructions.

### C. Ambiguous and Misleading

### 1. Contentions

The main point of contention between the parties is whether the police immunity instruction was ambiguous in a way that was reasonably likely to cause the jury to misunderstand and misapply the instruction.

15

City argues the term "due care" in the immunity instruction and the term "reasonable care" in the instruction defining negligence are interchangeable and did not, in any way, create an ambiguity or set forth a different standard. City refers to cases in which the terms "due care" and "reasonable care" were used to mean the same thing and asserts the juror declarations do not show the jurors were confused by the terms or felt that "due care" was a lesser standard.

Plaintiffs argue that it is questionable whether the jurors, as persons without legal training, would understand the awkwardly phrased special instruction meant a police officer was required to exercise due care to obtain the immunity. Even if the jurors discerned that meaning, plaintiffs argue the instruction did not define "due care" and, therefore, required the jurors to infer that "due care" was the equivalent of "reasonable care." Plaintiffs assert that the jurors were unlikely to infer the standards were the same and, thus, redundant. Instead, plaintiffs assert the jurors were more likely to infer that Officer Payne was protected by a different standard when she was enforcing the law.

### 2. *Analysis of Ambiguity*

We conclude the police immunity instruction was ambiguous because it did not clearly indicate when the immunity applied and when it did not apply.

First, the jury instructions did not define the phrase "exercising due care" and, as a result, required the jury to determine for itself what "due care" meant and whether the police immunity instruction was redundant to the negligence instructions.

Second, the cases cited by City that treat "due care" and the equivalent of "reasonable care" do not hold that laypersons who act as jurors recognize the two standards of care are the same. The fact that courts and lawyers regard the terms as interchangeable does not establish that jurors would interpret the terms in the same manner, particularly when that interpretation would render one of the instructions superfluous.

16

Therefore, we conclude that the police immunity instruction, viewed as a whole with the other instructions, was ambiguous—that is, susceptible to more than one reasonable interpretation. (See *Minkler v. Safeco Ins. Co. of America* (2010) 49 Cal.4th 315, 321 [terms are ambiguous if they are susceptible to more than one reasonable interpretation].)

### 3. *Likelihood the Instruction Was Misunderstood*

Not every ambiguity in a civil jury instruction constitutes reversible error. Here, reversible error occurred only if the ambiguity created a reasonable likelihood the jury misunderstood and misapplied the police immunity instruction. (*Collins v. Navistar, Inc.*, *supra*, 214 Cal.App.4th at p. 1500.) We conclude it did.

Initially, we note that the jury would have interpreted the ambiguity correctly only if it realized the police immunity instruction was redundant to the negligence instructions. This seems unlikely because the jury was instructed that "[*a*]*ll the instructions* are important because together they state the law that you will use in this case. You must consider all the instructions together."[6] (Italics added.) (See *People v. Albertson, supra,* 23 Cal.2d at p. 588 (conc. opn. of Traynor, J.) ["jury can hardly be aware that this instruction, formally declared by the court as the law applicable to the case, is irrelevant"].)

We recognize the jury was told that (1) some instructions might not apply due to the findings of fact the jury made and (2) "[i]f I repeat any ideas or rules of law during my instructions, that does not mean those ideas or rules are more important than the others." Being informed of the possibility of repetitious instructions would not have aided the jury in determining whether a variation in language restated an earlier legal

---

[6] The jury also was told that it was the court's "duty to instruct you on the law that applies to this case" and it "must follow the law exactly as I give it to you."

17

standard or set forth a different rule of law. Thus, we conclude, in total, the other instructions were more likely to have caused the jury to believe the ambiguity in the police immunity instruction set forth a standard different from reasonable care.

Another factor relevant to evaluating the likelihood of misunderstanding is the effect of closing argument on the ambiguity. (See *Soule*, *supra*, 8 Cal.4th at p. 570 [respondent's argument to jury might contribute to misleading effect of instruction].) Here, City's defense counsel emphasized the police immunity instruction by quoting it during closing argument to the jury. He did not explain the meaning of "due care" or inform the jury that negligent police officers were not protected by the immunity. Instead, shortly after quoting the instruction, defense counsel stated:

> "I am confronted by this question: If Claudia Payne was out to harm Dr. Harb, why would she call for the ambulance in the first place and create some record that an ambulance was there?"

This argument and the phrase "was out to harm Dr. Harb" suggested to the jury that Officer Payne was immune from liability so long as she did not act with the intent to harm Harb. Thus, counsel's argument implied that Officer Payne exercised "due care" so long as she did not intentionally attempt to injure Harb. Therefore, we conclude the closing argument of City's defense counsel is a factor that increased, rather than reduced, the probability the jury misunderstood the ambiguity in the police immunity instruction and the scope of the immunity provided by Government Code section 820.4.

Other factors that bear on the probability the jury misunderstood and misapplied an ambiguous instruction are whether the jury requested rereading of the erroneous instruction or related evidence. (See *Soule, supra*, 8 Cal.4th at p. 570.) Here, the jury did not need to ask to have an instruction reread because the jury was given a copy of the instructions when it went to the jury room to deliberate. The jury did request to hear the testimony of Paramedic Dumont again. His testimony was relevant to the issues of

18

Officer Payne's negligence and his own gross negligence.[7]  Many different inferences can be drawn from the jury's request to hear the testimony of Dumont again.  Ultimately, we do not believe the jury's request indicates, one way or the other, whether the jury misunderstood and misapplied the ambiguous police immunity instruction.

Another factor relevant to the probability the jury misapplied an ambiguous instruction is the closeness of the evidence on the critical issue, which in this case is Officer Payne's negligence.[8]  Here, City's expert witness on police practices testified that if the deposition testimony of Paramedic Dumont was true—that is, he told Officer Payne that she needed to transport Harb because he was having a stroke—then the actions of Officer Payne would not have been up to the standards of a well-trained police officer.  Also, plaintiffs' expert testified that Officer Payne's actions were below standards.  In short, the conflicting versions about what happened before the first ambulance left the scene presented a hotly contested issue bearing directly on the question of Officer Payne's negligence.  In short, the evidence was not so one-sided that there was little chance of the ambiguous instruction being misapplied.

Other evidence relevant to whether the jury misapplied the ambiguous instruction is set forth in the portions of the juror declarations that were not stricken by the trial court when ruling on the motion for new trial.

---

**7**    Health and Safety Code section 1799.106 provides that in order to encourage the provision of emergency medical services, a firefighter, police officer, nurse, paramedic or EMT "who renders emergency medical services at the scene of an emergency ... shall only be liable in civil damages for acts or omissions performed in a grossly negligent manner or acts or omissions not performed in good faith."  This provision does not apply to Officer Payne because she was not rendering medical services.

**8**    Our analysis of the impact of the ambiguity in the instruction would be much different if the decisive issue had been causation—that is, if the jury had found Officer Payne was negligent, but then found her negligence was not a substantial factor in causing harm to Harb.

"Evidence of jurors' internal thought processes is inadmissible to impeach a verdict. [Citations.] Only evidence as to objectively ascertainable statements, conduct, conditions, or events is admissible to impeach a verdict. [Citations.] Juror declarations are admissible to the extent that they describe overt acts constituting jury misconduct, but they are inadmissible to the extent that they describe the effect of any event on a juror's subjective reasoning process. [Citation.] Accordingly, juror declarations are inadmissible to the extent that they purport to describe the jurors' understanding of the instructions or how they arrived at their verdict. [Citations.]" (*Bell v. Bayerische Motoren Werke Aktiengesellschaft* (2010) 181 Cal.App.4th 1108, 1124-1125, fn. omitted.) The foregoing principles are derived from Evidence Code section 1150,[9] which became effective on January 1, 1967 (Stats. 1965, ch. 299, § 2), and *People v. Hutchinson* (1969) 71 Cal.2d 342, the first California Supreme Court decision to discuss the new statute.

Here, the parties do not challenge the trial court's ruling regarding the contents of the juror's declarations. Furthermore, our review of that ruling leads us to conclude the trial court correctly applied the foregoing rules of law when it struck portions of the juror declarations and did not strike the paragraph in each of the three declarations that stated (1) the jurors discussed the police immunity instruction and (2) "I verbally agreed that this instruction did not permit us to find negligence on the part of defendants [Officer] Payne and the City of Bakersfield."

---

[9]    Subdivision (a) of Evidence Code section 1150 provides: "Upon an inquiry as to the validity of a verdict, any otherwise admissible evidence may be received as to statements made, or conduct, conditions, or events occurring, either within or without the jury room, of such a character as is likely to have influenced the verdict improperly. No evidence is admissible to show the effect of such statement, conduct, condition, or event upon a juror either in influencing him to assent to or dissent from the verdict or concerning the mental processes by which it was determined."

These declarations by three jurors indicate that the police immunity instruction was discussed in a way that did not treat the instruction as redundant to the negligence instructions. Thus, the declarations support the position that the jurors did not understand the police immunity instruction and misapplied it.

Based on our review of these relevant factors, we conclude there was a reasonable likelihood that the jury misunderstood and misapplied the ambiguous police immunity instruction. Therefore, plaintiffs have demonstrated the error was prejudicial and a new trial is warranted as to City and Officer Payne.

IV.     COMPARATIVE NEGLIGENCE INSTRUCTION

A.     Contents of the Instruction

The trial court gave the following jury instruction (using CACI No. 405) regarding Harb's comparative negligence:

> "The defendants claims that plaintiff Mohamad Harb's own negligence contributed to his harm. To succeed on this claim, the defendants must prove both of the following: [¶] 1. That plaintiff Mohamad Harb was negligent; and [¶] 2. That plaintiff's Mohamad Harb's negligence was a substantial factor in causing his harm.
>
> "If the defendants prove the above, Mohamad Harb's damages are reduced by your determination of the percentage of plaintiff Mohamad Harb's responsibility. I will calculate the actual reduction."

Counsel for plaintiffs objected to the instruction on the ground that defendants should not be allowed to argue that Harb's stroke was due to his negligence.

B.     Claim of Instructional Error

1.     Contentions

Plaintiffs contend they did not sue defendants for causing Harb's stroke, but only for the *additional harm* defendants caused by delaying his treatment. Based on this approach to recoverable damages, plaintiffs contend it was error for the trial court to instruct on comparative negligence and allow defendants to refer to Harb's negligence

21

before the stroke and automobile accident. In plaintiffs' view, California law forbids first responders from blaming the victims for placing themselves in peril.

Plaintiffs, in effect, ask this court to adopt the following rule of law: First responders to the scene of an accident (such as police officers, paramedics and EMT's) cannot reduce their liability by asserting it was the accident victim's own fault for requiring care in the first place, provided that the victim's claim is limited to injuries caused by the first responders' tortious acts or omissions. In other words, plaintiffs contend any negligence by a victim before the police or paramedics arrive on the scene is irrelevant because tortfeasors take the victim as they find him.

In response, City relies on general principles of comparative fault and contends the evidence of Harb's failure to control his blood pressure was properly admitted and the contributory negligence instruction was proper. City argues Harb's outcome was predetermined before the accident when the severe hemorrhage occurred and "certainly prior to any of the defendants having any contact with Dr. Harb."[10]

### 2. *Current Status of California Law*

First, the California Supreme Court has not addressed whether an accident victim's preaccident negligence qualifies as comparative negligence that first responders can assert to reduce their liability for damages caused by their tortious acts or omissions.

Second, the parties have not cited, nor have we located, any decision by the California Court of Appeal that decides or even mentions this issue.

Third, the first responders' situation could be viewed as analogous to the position of health care professionals who treat patients for injuries or conditions that were caused by the patient's negligence. However, the parties have not cited, and we have not

---

[10] This argument goes to causation, not to the apportionment of responsibility between two or more persons whose conduct was a substantial factor in causing the harm.

located, any decision by a California appellate court that addresses whether *pretreatment* negligence by a patient can be asserted as comparative negligence by a health care professional in a medical malpractice action.[11]

Fourth, California is among those jurisdictions that have adopted the familiar principle of tort law that a "tortfeasor takes the plaintiff as he finds him." (*Bowen v. Board of Retirement* (1986) 42 Cal.3d 572, 580; 3 Croskey, Cal. Practice Guide: Insurance Litigation (The Rutter Group 2013) ¶ 13:90, pp. 13-24.2 to 13-25.) This basic principle will serve as part of the foundation for the rule of law adopted in this opinion. (See pt. IV.D, *post*.)

## C. Overview of Other Jurisdictions

Many other jurisdictions have addressed whether health care professionals sued for medical malpractice can assert a patient's pretreatment negligence is comparative or contributory negligence. (See Comment, *Defense of Patient's Contribution to Fault in Medical Malpractice Actions* (1992) 25 Creighton L.Rev. 665; Annot., *Contributory Negligence, Comparative Negligence, or Assumption of Risk, Other than Failing to Reveal Medical History or Follow Instructions, as Defense in Action Against Physician or Surgeon for Medical Malpractice* (2003) 108 A.L.R.5th 385.) The courts generally

---

[11] California courts have addressed contributory negligence that is contemporaneous with the medical treatment. (*Puffinbarger v. Day* (1962) 207 Cal.App.2d 540 [in wrongful death action, a jury instruction on parent's contributory negligence was appropriate where mother did not follow doctor's instructions regarding care of daughter]; *Dodds v. Stellar* (1946) 77 Cal.App.2d 411 [whether plaintiff with finger burned by X-rays used due diligence in deciding not to undergo amputation of finger when first suggested by doctor was a question for the jury; finding for plaintiff upheld].) In addition, in *Barton v. Owen* (1977) 71 Cal.App.3d 484, the court concluded instructing the jury on the patient's contributory negligence was error because there was no evidence to support the claim that the patient's allegedly negligent activities were a proximate cause of his brain abscess. The contributory negligence alleged in these cases involved matters arising *after* the medical treatment had begun.

23

agree that a patient's conduct *prior* to seeking medical attention should not be considered in assessing damages. (Comment, *supra*, 25 Creighton L.Rev. at p. 687.) In contrast, most courts have held that the concept of contributory negligence can be applied to a patient's conduct that is concurrent or contemporaneous with the physician's negligence. (*Ibid*.; see fn. 11, *ante*.)

The cases discussed below are from jurisdictions that are similar to California in that they apply a comparative fault system (either pure or modified) rather than treating contributory negligence as a complete bar to recovery.

### 1. Oregon—2010

In *Son v. Ashland Community Healthcare Services* (2010) 239 Or.App. 495 [244 P.3d 835] (*Son*), the mother of a 16-year-old girl filed a wrongful death action against two physicians who treated her daughter for a drug overdose. The physicians asserted various affirmative defenses, including that the daughter was at fault for (1) consuming a variety of substances that led to her hospitalization and (2) not providing accurate information to defendants about what substances she consumed, the quantity taken and the time she consumed each. (*Id*. at p. 838.) The trial court struck the defense of the daughter's comparative fault for taking the pills and allowed the defense about inaccurate information to go to the jury. (*Id*. at pp. 838-839.) The jury determined each doctor was 30 percent at fault, the daughter was 25 percent at fault, and her father was 15 percent at fault. (*Id*. at p. 839.) After the trial court entered judgment, each side appealed. The mother claimed the jury should not have been allowed to consider the comparative fault of the daughter and her father. The doctors claimed the trial court improperly struck their defense that the daughter was comparatively at fault for consuming the substances that led to her medical condition and ultimately her death. (*Id*. at p. 839.)

As to the question whether the daughter's consumption of substances could be considered by the jury in its allocation of fault, the court concluded that the consumption

24

of drugs was not the type of conduct that could support a comparative fault defense. (*Son*, *supra*, 244 P.3d at p. 842.) The court explained its conclusion by stating, "the focus in a medical malpractice case is on the injury caused by the negligent treatment, not the original injury that created the need for treatment." (*Id*. at p. 843.) The court stated its "conclusion is in line with the majority of other jurisdictions that have dealt with this issue." (*Ibid*.) Under the majority rule, contributory or comparative negligence is not available as a defense when the patient's conduct provides the occasion for medical attention. (*Id*. at pp. 843-844.) Thus, the court distinguished between a patient's pretreatment conduct and conduct that occurs concurrently with the provision of medical services.[12] (*Id*. at p. 844.) Applying this distinction, the court concluded the trial court correctly struck the comparative negligence defense related to the daughter's consumption of the substances that led to her hospitalization.

### 2. Tennessee—2004

In *Mercer v. Vanderbilt University, Inc.* (Tenn. 2004) 134 S.W.3d 121, the patient had been seriously injured in a single-car accident. His blood-alcohol level at the time of the accident was approximately 0.20 percent. (*Id*. at p. 125.) The patient's conservator brought a medical malpractice action against the hospital, a nurse and a respiratory therapist, alleging their negligent treatment of the patient resulted in his cardiac arrest, which caused severe and permanent brain damage. (*Id*. at p. 126.) The plaintiff alleged the therapist attached the patient's ventilator to a half-full oxygen tank that ran out during his CT scans and the therapist and nurse failed to monitor his condition properly during the procedure. (*Ibid*.) The jury apportioned the fault 70-30 between the hospital and the patient and a judgment for approximately $5.2 million was entered in favor of the

---

[12]  An example of a patient's negligence that occurs concurrently with medical treatment is the patient's failure to provide accurate information to health care providers.

25

plaintiff. (*Id*. at p. 127.) The court of appeals reversed and remanded for a new trial. The Tennessee Supreme Court reversed and reinstated the jury's verdict in the amount of $7,366,000, with no reduction for the jury's assessment of fault to the patient. (*Id*. at p. 135.)

The court noted that "most jurisdictions have held that a patient's negligence that provides only the occasion for medical treatment may not be compared to that of a negligent physician. [Citations.]" (*Mercer v. Vanderbilt University, Inc.*, *supra*, 134 S.W.3d at p. 128.) The court determined these cases were convincing and agreed with the position that patients who may have negligently injured themselves are nevertheless entitled to subsequent nonnegligent medical treatment and to an undiminished recovery if the subsequent medical treatment is negligent. (*Id*. at p. 130.) Consequently, the court overruled its decision in *Gray v. Ford* (Tenn. 1996) 914 S.W.2d 464 and stated:

> "In the present case, [the patient's] negligence merely provided the occasion for the medical care, attention, and treatment that gave rise to this medical malpractice action. We therefore hold that the principles of comparative fault do not apply so as to allow fault to be assessed to [the patient]. We recognize that [the patient's] medical treatment was complicated by his alcohol withdrawal and that evidence concerning his alcohol consumption was clearly relevant to his treatment and to Vanderbilt's theory of causation. We hold, however, that [the patient's] antecedent negligence should not have been considered by the jury in assessing fault." (*Mercer v. Vanderbilt University, Inc.*, *supra*, 134 S.W.3d at p. 130.)

### 3. *West Virginia—2001*

In *Rowe v. Sisters of Pallottine Missionary Society* (2001) 211 W.Va. 16 [560 S.E.2d 491] (*Rowe*), the plaintiff crashed his motorcycle while participating in a motocross event and injured his left leg. An emergency room physician treated and discharged the plaintiff, but complications involving a lacerated artery developed. (*Id*. at pp. 494-495.) Subsequent extensive surgery saved the leg, but the plaintiff was hospitalized for 35 days and his use of the leg was significantly impaired. (*Id*. at p. 495.)

26

The plaintiff sued the doctor and hospital for negligence. (*Rowe*, *supra*, 560 S.E.2d at p. 495.) The doctor settled and the case proceeded to trial against the hospital alone. (*Ibid*.) The jury returned a verdict against the hospital for $880,186. (*Id*. at p. 496.)

On appeal, the hospital argued the jury should have been instructed on principles of comparative negligence, including the negligence of the plaintiff in crashing his motorcycle. (*Rowe*, *supra*, 560 S.E.2d at p. 496.) The West Virginia Supreme Court stated that a "majority of courts hold that a health care provider cannot compare the plaintiff's negligence conduct that triggered the need for treatment with the health care provider's later negligence in treating the plaintiff." (*Id*. at p. 497.) The court stated the reason for this rule was simple and obvious—patients who may have negligently injured themselves are entitled to subsequent nonnegligent medical care and to an undiminished recovery if reasonable medical treatment is not afforded. (*Ibid*.) The court adopted the majority approach and concluded the trial court did not err in refusing to give the comparative negligence instruction requested by the hospital. (*Ibid*.)

### 4. *Montana—2000*

In *Harding v. Deiss* (2000) 300 Mont. 312 [3 P.3d 1286] (*Harding*), a mother sued two physicians who treated her daughter before she died. The trial court instructed the jury on contributory negligence and allowed the physicians to argue to the jury that decedent's conduct before she was taken to the emergency room caused her death. (*Id*. at p. 1287.) The Montana Supreme Court reversed the judgment in favor of the physicians, concluding that the defense of contributory negligence was improper under the facts presented. (*Id*. at p. 1291.)

In *Harding*, the decedent went horseback riding despite the fact she had asthma, was allergic to horses and had a long history of breathing difficulties. (*Harding*, *supra*, 3 P.3d at. p. 1287.) During the ride, she began to have trouble breathing and eventually

27

collapsed. (*Ibid*.) She was taken by ambulance to a hospital's emergency room where she was treated by one of the defendants. (*Ibid*.) The next day, she was transferred to a different hospital and was treated by the other defendant. (*Ibid*.)

The court began analyzing whether it was appropriate to instruct the jury on contributory negligence by stating it was necessary to clarify the sequence of events in relation to the interwoven doctrines of contributory or comparative negligence, proximate cause, and avoidable consequences. (*Harding*, *supra*, 3 P.3d at p. 1288.) To accomplish this clarification, the court identified three temporal settings: (1) the pretreatment period, (2) the period during which the alleged malpractice occurred, and (3) the period after the alleged malpractice. (*Id*. at p. 1289; see Stein, *Toward a Theory of Medical Malpractice* (2012) 97 Iowa L.Rev. 1201, 1223-1224 [practitioner's ability to invoke comparative negligence defense is limited by the "timeline rule" which identifies three periods].) Next, the court discussed cases concluding the pretreatment health habits of a patient or other negligent acts that precede the physician's medical treatment cannot be considered as evidence of fault. (*Harding*, *supra*, at. p. 1289.) The Montana Supreme Court agreed with those cases and concluded "that comparative negligence as a defense does not apply where a patient's pre-treatment behavior merely furnishes the need for care or treatment which later becomes the subject of a malpractice claim. The patient's conduct before seeking medical treatment is merely a factor the physician should consider in treating the patient." (*Id*. at p. 1289.) The court regarded the patient's pretreatment health habits as being relevant only to the issue of proximate causation.[13] (*Id*. at p. 1289.) Because the

---

[13]     To reiterate this point, a patient's health habits, actions or omissions that occur before treatment are not relevant to an analysis of fault, but these factors are relevant to an analysis of the causation issue. (Stein, *Toward a Theory of Medical Malpractice*, *supra*, 97 Iowa L.Rev. at p. 1224.) For example, "a plaintiff who negligently breaks his arm and receives negligent treatment from a doctor that necessitates amputation of that arm, can recover only damages *attributable to* the amputation, but cannot recover for any

decedent's horseback riding was pretreatment conduct, the court concluded instructing the jury on comparative negligence was an abuse of discretion. (*Ibid.*)

### 5. Colorado—1993

In *Spence v. Aspen Skiing Co.* (D.Colo. 1993) 820 F.Supp. 542, the plaintiff became dizzy while skiing at a facility owned by the Aspen Skiing Company. (*Id*. at p. 543.) The member of the company's ski patrol who answered the called was an EMT. He gave the plaintiff an intravenous (IV) solution. Subsequently, the plaintiff experienced redness, swelling and other symptoms in the arm receiving the IV. Surgery was required and the plaintiff lost some use of her arm. The plaintiff sued the ski company, alleging its employee, the EMT, was negligent in inserting the IV and tending to it after insertion. The ski company asserted the plaintiff's failure to properly treat her hypoglycemia constituted negligence that contributed to any damage she sustained. The jury completed a special verdict and found (1) the plaintiff sustained total damages of $38,500 and (2) 95 percent of the damage was chargeable to the plaintiff and 5 percent was chargeable to the ski company. (*Id*. at p. 542.)

The plaintiff filed a motion for new trial, asserting the district court should not have instructed the jury that it could consider the plaintiff's comparative negligence. (*Spence v. Aspen Skiing Co.*, *supra*, 820 F.Supp. 542.) The district court concluded (1) the language in Colorado's comparative negligence statute was inconclusive on the issue, (2) no Colorado state court decision addressed the issue, and (3) it was persuaded by cases from other jurisdictions that held the patient's negligence could not be asserted as a defense where the patient's conduct provided the occasion for medical attention, care or treatment. (*Id*. at pp. 543-544.) The court stated: "It would be inconsistent with the

damages *related to* the broken arm." (*Son*, *supra*, 244 P.3d at p. 843, italics added to words denoting causation.)

reasonable and normal expectations of both parties for the court to excuse or reduce the provider's liability simply because it was the patient's own fault that she required care in the first place." (*Id*. at p. 544.) Consequently, the district court entered a judgment in favor of the plaintiff for the full amount of the damages found by the jury. (*Id*. at p. 545.)

### 6. Florida—1975 & 1981

In *Matthews v. Williford* (Fla.App. 1975) 318 So.2d 480 (*Matthews*), the plaintiff filed a wrongful death action against a doctor, alleging medical negligence. (*Id*. at p. 481.) The trial court refused to instruct the jury on the patient's comparative negligence and the jury returned a verdict for the plaintiff. (*Ibid*.) The doctor appealed, contending the trial court erred in refusing to give the comparative negligence instruction.

The patient-decedent was admitted to the hospital for chest pains and shortness of breath, but was not placed in the coronary care unit. (*Matthews*, *supra*, 318 So.2d at p. 482.) Early the next morning, he died from a massive heart attack. (*Ibid*.) Ten years earlier, the patient had a heart attack and was advised that he should not smoke and should not become overweight. (*Ibid*.) The plaintiff's expert testified that if the patient had been properly diagnosed and placed in a coronary care unit, the damage to his heart would have been less and he would not have died. (*Ibid*.) Consistent with this testimony, the plaintiff did not claim damages for the heart attack itself, but for the losses from the period the patient would have lived if he had survived the heart attack. (*Id*. at p. 483.) The court concluded that any conduct on the part of the patient contributing to the heart attack was not a proximate cause of the damages sought, stating:

> "In short, conduct prior to an injury or death is not legally significant in an action for damages like this, unless it is a legal or proximate cause of the injury or death—as opposed to a cause of the remote conditions or occasion for the later negligence. So it is with conduct of a patient which may have contributed to his illness or medical condition, which furnishes the occasion for medical treatment. That conduct simply is not available as a defense to malpractice which causes a distinct subsequent injury—here, the ultimate injury, wrongful death." (*Id*. at p. 483.)

30

The same approach was applied in *Whitehead v. Linkous* (Fla.App. 1981) 404 So.2d 377, a case where the patient apparently attempted suicide by consuming Valium, Darvocet and large amounts of beer. He was brought by ambulance to a hospital's emergency room and died. The appellate court followed the *Matthews* decision, held the trial court erred in giving a comparative negligence instruction, and reversed the jury's finding that the patient was 67 percent negligent. (*Id*. at p. 379.)[14]

---

[14] Courts in other comparative fault jurisdictions have reached the same result. Those cases include, but are not limited to, *DeMoss v. Hamilton* (Iowa 2002) 644 N.W.2d 302 (error to give comparative fault instruction where patient's failure to lose weight and stop smoking contributed to the heart attack for which medical treatment was sought); *Huffman v. Thomas* (1999) 26 Kan.App.2d 685 [994 P.2d 1072] (medical provider's liability is not reduced simply because it was the patient's own fault that he or she required medical care); *Harvey ex rel. Harvey v. Mid-Coast Hospital* (D.Me. 1999) 36 F.Supp.2d 32 (comparative fault does not apply in a medical malpractice action where plaintiff attempted suicide and hospital subsequently negligently administered treatment); *Fritts v. McKinne* (Okla.App. 1996) 934 P.2d 371 (*Fritts*) (physician may not avoid liability for negligent treatment by asserting the patient's injuries were caused by the patient's own negligence in operating vehicle while drunk); *Lambert v. Shearer* (1992) 84 Ohio App.3d 266 [616 N.E.2d 965] (under Ohio law a patient's negligence can diminish recovery under principles of comparative negligence, but the patient's negligence must be contemporaneous with the physician's malpractice; patient's 30 years of smoking was not relevant to claim doctor failed to diagnose and treat his lung cancer); and *Martin v. Reed* (1991) 200 Ga.App. 775 [409 S.E.2d 874] (*Martin*) (trial court erred in refusing plaintiff's jury instruction that stated jury should not consider the cause of the automobile wreck because it had no legal connection to whether the doctor's subsequent actions at the hospital constituted malpractice).

Similarly, decisions from jurisdictions where the all-or-nothing rule of contributory negligence was in effect have concluded that a patient's pretreatment negligence does not constitute contributory negligence. (*Cavens v. Zaberdac* (Ind. 2006) 849 N.E.2d 526 [in wrongful death action, trial court correctly refused emergency room physician's request to assert the defense of contributory negligence based on evidence of the patients' excessive use of asthma medication and her delay in seeking treatment at the emergency room]; *Jensen v. Archbishop Bergan Mercy Hospital* (1990) 236 Neb. 1 [459 N.W.2d 178] [patient's failure to heed doctor's advice to lose weight may have caused pulmonary embolism, but was irrelevant to claim that doctor later negligently treated the condition]; *Eiss v. Lillis* (1987) 233 Va. 545 [357 S.E.2d 539] [proposition that treating

*7.        Secondary Authorities*

The foregoing cases set forth the majority view that pretreatment negligence by the patient does not warrant a jury instruction on contributory or comparative negligence. This view is supported by comment m to section 7 of the Restatement Third of Torts: Apportionment of Liability, which states: "[I]n a case involving negligent rendition of a service, including medical services, a factfinder does not consider any plaintiff's conduct that created the condition the service was employed to remedy."

The majority view is expressed in a California practice guide that addresses malpractice actions: "Negligence, in fact, may often explain why the patient, to begin with, needed and sought out the physician's assistance. The health care professional, in this instance, takes the patient as he finds him. Other than in very rare cases, the only legitimate application of the doctrine of contributory fault is when it takes place concurrently with or after the delivery of the practitioner's care and treatment." (McDonald, 1 Cal. Medical Malpractice Law & Practice (2014) § 10:13.)

D.        Conclusion Regarding California Law

Based on the reasoning set forth in the cases from other jurisdictions, the secondary authorities, and California's adoption of the basic principle of tort law that a "tortfeasor takes the plaintiff as he finds him" (*Bowen v. Board of Retirement*, *supra*, 42 Cal.3d at p. 580), we conclude the majority rule should be applied in California.[15]

physician should not be liable for malpractice if the plaintiff's negligence led to the hospitalization is obviously wrong]; *Sendejar v. Alice Physicians & Surgeons Hospital, Inc.* (Tex.App. 1977) 555 S.W.2d 879 [in a malpractice action regarding treatment of back injury, patient's negligent driving should not have been submitted to jury under the defense of contributory negligence].)

[15]        Defendants have chosen to ignore the cases from other jurisdictions and their appellate briefing has not acknowledged the majority rule or directly addressed the reasoning behind it. As a result, they have not presented a convincing argument why this court should reject the majority rule.

Therefore, the issue of a plaintiff's comparative fault should not be presented to the jury when the plaintiff's allegedly negligent conduct occurred before the first responders arrived at the scene of the accident.

Applying this rule of law to the facts of this case, we conclude the jury should not have been instructed on Harb's negligence using CACI No. 405 and defense counsel should not have been allowed to argue to the jury that Harb's failure to control his blood pressure was negligence that contributed to the injuries for which plaintiffs sought damages.

E.      Prejudice

Defendants contend there was no prejudice from the erroneous jury instruction on comparative negligence because the jury never reached question No. 5 in the special verdict form that asked, "Was the plaintiff Mohamed Harb contributorily negligent?"

1.      *Prejudice from Giving a Comparative Negligence Instruction*

Initially, we note it is common for appellate courts to conclude an erroneous instruction was harmless where the jury does not reach the question addressed by the erroneous instruction. (E.g., *Spriesterbach v. Holland* (2013) 215 Cal.App.4th 255, 273 [jury found motorist was not negligent and did not reach question of the plaintiff-bicyclist's negligence in causing collision]; *Vahey v. Sacia* (1981) 126 Cal.App.3d 171, 179 [erroneous refusal to give instruction regarding damages was not prejudicial because jury found defendant was not liable and did not reach damages]; *Thompson v. Keckler* (1964) 228 Cal.App.2d 199, 214 [purportedly erroneous instructions regarding damages were not prejudicial because jury never reached question of damages].) Nevertheless, the conclusion of no prejudice is not automatic because California courts are required to conduct "an examination of the entire cause." (Cal. Const., art. VI, § 13.) Under this constitutional directive, courts must determine the question of prejudice based on the facts and circumstances of the particular case.

33

Courts in other jurisdictions have found prejudice from the erroneous giving of a comparative negligence instruction in cases where the jury did not reach that issue.

For example, in *Harding*, *supra*, 3 P.3d 1286, the court rejected the defendant doctor's argument that the erroneous instructions on the deceased patient's negligence were a moot issue because the jury found for the defendants without reaching the issue of the patient's negligence. Instead, the court concluded that the defendants' statements during opening argument and points raised during cross-examination denied the plaintiff a fair and impartial trial. (*Id*. at p. 1291.)

In *Fritts*, *supra*, 934 P.2d 371, an Oklahoma appellate court concluded that (1) the submission of the decedent's comparative negligence to the jury was error and (2) there was a strong probability the erroneous instruction mislead the jurors and affected the outcome. (*Id*. at p. 375.) In *Fritts*, the comparative negligence concerned the decedent's negligence in crashing his pickup. (*Id*. at p. 372.) The trial court admitted evidence regarding the decedent's drinking at the time of the accident and evidence of his chronic substance abuse. (*Id*. at p. 375.) The appellate court concluded this evidence was irrelevant and extremely inflammatory on the issue of liability. (*Id*. at p. 376.) The judgment was reversed and the case remanded for a new trial.

In *Martin*, *supra*, 409 S.E.2d 874, the plaintiff lost control of his vehicle and collided with a guardrail. After receiving medical treatment, he became paralyzed. The plaintiff sued the medical care providers, claiming his paralysis was the proximate result of their negligent diagnosis and treatment. The trial court refused to give a proposed instruction directing the jury not to consider the cause of the automobile wreck in deciding whether the defendants were liable for medical malpractice. (*Id*. at p. 876.) The appellate court determined this refusal was error. (*Id*. at p. 877.) In addition, the court concluded, without analysis, that the instructional error was not harmless and remanded for a new trial. (*Ibid*.)

34

In *Tobia v. Cooper Hospital University Medical Center* (1994) 136 N.J. 335 [643 A.2d 1], the defendants in a medical malpractice action argued an incorrect jury instruction on the patient's comparative negligence had been rendered moot by the jury's finding the defendants had not been negligent. (*Id.* at p. 5.) The New Jersey Supreme Court concluded the erroneous instruction may have affected the verdict by improperly focusing the jury's attention on the patient's conduct. (*Ibid.*) As a result, the court reversed the judgment and remanded for a new trial. (*Id.* at p. 6.)

In contrast to the results in the foregoing cases, the Iowa Supreme Court concluded a trial court's error in giving a comparative fault instruction resulted in no prejudice because, in accordance with the verdict form, the jury found no causal fault on the doctor's part and answered none of the verdict form's questions about the deceased patient's comparative fault. (*DeMoss v. Hamilton*, *supra*, 644 N.W.2d at p. 307.)

### 2. California's Approach to Contributory Negligence

For historical context, we note that when the all-or-nothing rules of contributory negligence were the law of California, the following principles regarding reversible (i.e., prejudicial) error were applied:

> "If there is evidence of contributory negligence, even though it is slight as compared to the negligence of the defendant, a refusal to give an instruction on contributory negligence is error and such error is obviously prejudicial. [Citation.] However, giving an instruction on contributory negligence where there is no evidence to support it is reversible error. (*Burks v. Blackman* (1959) 52 Cal.2d 715 [344 P.2d 301].)" (*Simmons v. Wexler* (1979) 94 Cal.App.3d 1007, 1012 [trial court did not err in refusing to give contributory negligence instruction because there was no showing of contributory negligence by motorcyclist].)

If this latter principle were extended to California's current comparative fault scheme, it would mean that giving an instruction on comparative negligence where there is no evidence to support it is reversible error. We do not think such a bright-line rule regarding prejudice is appropriate in current times. Instead, we will analyze the facts and

35

circumstances of this case to determine whether prejudice resulted from the erroneous comparative negligence instruction.[16] (See *Vine v. Bear Valley Ski Co.* (2004) 118 Cal.App.4th 577, 601 [prejudicial effect of instruction error requires evaluation of "(1) the state of the evidence; (2) the effect of other instructions; (3) the effect of counsel's arguments; and (4) any indications by the jury itself that it was misled"].)

### 3. *Analysis of Facts of this Case*

Plaintiffs' motion in limine No. 1 sought to exclude evidence that (1) Harb's blood pressure was high, (2) he failed to take medication to control his high blood pressure, and (3) if he had taken that medication, the incident would not have happened. The trial court denied the motion and allowed the presentation of the evidence upon which the comparative negligence defense was based.

During opening statements to the jury, City's defense counsel referred to Harb's medical history and told the jury it would hear testimony from a doctor that Harb did not follow that doctor's instructions about taking important medications. Defense counsel told the jury Harb's failure to take the medication was important because the evidence would show that a major cause of a hemorrhagic stroke is hypertension, exactly the condition that the medications prescribed were intended to treat. Later in his opening statement, defense counsel again referred to the issue of Harb's failure to take medication for hypertension and read a portion of the deposition of Harb's personal physician to the jury about the medication and Harb's failure to take it.

---

[16]    This conclusion and the facts presented in *Romo v. Southern Pac. Transportation Co.* (1977) 71 Cal.App.3d 909, leads us to reject defendants' argument that *Romo* establishes a rule of law that giving an instruction on a plaintiff's comparative negligence cannot constitute reversible error when the jury never reaches the issue. In *Romo*, the plaintiff claimed an error arose from the verdict forms submitted to the jury, not the instructions, which the court determined "fully and fairly presented the comparative negligence rule." (*Id*. at p. 921.)

Thus, the opening statements introduced the jury to defendants' argument regarding who was to blame and their position that Harb's failure to take medication for his hypertension was important.

During the trial, defendants examined Harb's personal physician, his wife and Dr. Alberstone about Harb's hypertension, a 2004 stroke and his subsequent failure to take the medication prescribed for his hypertension.

Parvez Memon, M.D., first saw Harb as a patient in June 2004 when Harb was admitted to the hospital with stroke-like symptoms. The defense attorneys' cross-examination of Dr. Memon focused on Harb's medical history, his 2004 stroke that was diagnosed as a lacunar infarct, the medications subsequently prescribed, and whether Harb took those medications. The defense attorneys' cross-examination of Mrs. Harb also addressed his 2004 stroke, medical history and whether Harb was taking his medications. Finally, City's defense counsel's cross-examination of Dr. Alberstone elicited his opinion that if Harb had followed his doctor's advice and taken his blood pressure medication, it would have reduced the risk of having the hemorrhage and the extent of the hemorrhage.

During his closing arguments, City's defense counsel told the jury that "Harb gambled with his own life.… He owns all of the responsibility here as to what happened.… [¶] … [¶] He chose that path." To support this position, defense counsel referred to Dr. Alberstone's testimony that if Harb had taken his blood pressure medication it would have reduced the risk of having a hemorrhage and the extent of the hemorrhage. Defense counsel told the jury that Harb failed in his responsibility to his family, as its sole income earner, to take care of his health.

The opening statements, the state of the evidence, the nature of the erroneous instruction, and the closing arguments of counsel convince us that there is "a reasonable probability that in the absence of the error, a result more favorable to the appealing party

37

would have been reached." (*Soule*, *supra*, 8 Cal.4th at p. 574.) In short, allowing the issue of Harb's comparative negligence in failing to take his blood pressure medication may have affected the findings that the defendants were not at fault by improperly focusing the jury's attention on the patient's conduct. (See *Tobia v. Cooper Hospital University Medical Center, supra,* 643 A.2d at p. 5.)

Therefore, plaintiffs have established the instructional errors were prejudicial and a new trial is warranted as to all of the defendants.

## DISPOSITION

The judgment is reversed and the matter remanded to the superior court for a new trial. Appellants shall recover their costs on appeal.

_____
Franson, J.

WE CONCUR:

_____
Gomes, Acting P.J.

_____
Detjen, J.